**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**L. C. GREEN, Defendant-Appellant.**

**No. 30042.**

United States Court of Appeals,
Fifth Circuit.

Aug. 11, 1971.

**1170**

Robert E. McDonald, Jr., Mobile, Ala., for defendant-appellant.

C. S. White-Spunner, Jr., U. S. Atty., Irwin W. Coleman, Jr., Asst. U. S. Atty., Mobile, Ala., for plaintiff-appellee.

Before RIVES, THORNBERRY and CLARK, Circuit Judges.

RIVES, Circuit Judge:

Green was convicted of the theft [1] of 525 cases of Cutty Sark Scotch Whiskey, 105 cases of Hennessy Cognac, and 95 cases of De Vin Wine, which were moving as an interstate shipment by motor truck from the Alabama State Docks in Mobile to the Collector of Customs in Nashville, Tennessee. He was sentenced to imprisonment for six years.

The Government's evidence went to prove that Green and his son arranged a fake hijacking with Jack Lindsey, the driver of the motor truck, and made arrangements with Robert Carl Watson to sell the cargo. Lindsey and Watson testified against Green.

On appeal Green presents four issues to show reversible error, which will be quoted from his brief and discussed. We find no reversible error and affirm.

The Government proved by undisputed evidence that the goods of a value far in excess of $100.00 were stolen while moving as an interstate shipment by motor truck.

According to Lindsey's testimony, he started with the shipment on the journey from Mobile to Nashville, and, pursuant to plans for hijacking, he was followed by Green and Green's son in Green's station wagon. Before reaching the Alabama state line, they stopped their two vehicles and together examined the bill of lading. Lindsey then took Green's son in the truck with him "to be sure that he could drive the truck." Lindsey testified:

> "Well, we looked at the bill of lading and we couldn't make too much of it and decided rather than looking in the trailer there we would go on to the other designated stop to stop the truck." [R. 195]

The next stop was at an abandoned night club across the Alabama-Mississippi line. There Lindsey and Green's son painted out the Central Motor Express signs on the tractor and trailer with a spray bottle of red paint. They stood

1. In violation of 18 U.S.C. § 659.

on the ground in spraying paint on the tractor, and Green's son stood on the top of Green's station wagon to spray paint on the trailer.[2]

At this spot another man came up with whom Green departed for a short time. Upon their return, Green broke the seal on the truck and they looked inside. Green's son then departed with the truck and its contents, while Lindsey rode with Green to some woods near Safford, Alabama, where Lindsey was tied up. In due course Lindsey worked loose, reported a hijacking to the Sheriff and was later interviewed by FBI agents. In the same district court some eleven months before Green's trial, Lindsey had pleaded guilty to stealing the whiskey and liquors, but his sentencing was being delayed.

Robert Carl Watson proved at first to be a reluctant witness. He refused to testify to his part in the hijacking unless the Judge would assure him that an agreement for his immunity would be honored. The Judge declined so to assure him, but granted a brief recess for the United States Attorney to talk to Watson. After that talk, Watson agreed to testify. Before he did so, defense counsel examined him on voir dire and after some urging by Government counsel—"Answer his question as to what you told me and I told you in that room back there"—Watson admitted that, "Well, the substance of it was I may still be subject to prosecution if I don't testify." Defendant's counsel objected to Watson's being required to testify under what he termed "a threat of prosecution if he doesn't." [R. 261] The court overruled that objection and permitted Watson to testify.

As a part of his further testimony in chambers outside of the jury's presence, Watson testified that he selected Green's photograph from several shown him by an FBI agent, and that the photograph of Green showed him in federal custody. Watson answered an inquiry from the court as follows:

> "THE COURT: Even though you identified Mr. Green before these photographs were shown to you this morning, could you have identified him without the mental pictures you had of the photographs that you had picked out? That is, did you have an independent recollection that he is the man that you saw over there at your house on the occasion you talked about?
>
> "A. Yes, sir." [R. 285, 286.]

The identification by photograph was made about a week after the occasion of the visit to Watson of the man whose identity was being sought.

Also testifying at the hearing in chambers preceding Watson's further testimony before the jury was the FBI agent, James Edward King. Mr. King testified that he handed Watson seven photographs with no suggestion of interest in any particular one. On cross-examination it was developed that five of the seven photographs appeared to be of men in some type of state custody, while the picture of Green and that of another man who was also suspected of being implicated in this theft appeared to be of men in federal custody, and also that those two photographs included the full torso while the other five were of the face and upper torso. At the conclusion of the in-chambers hearing, the district court overruled the defendant's motion to suppress or not allow before the jury the identification of Green by the witness Watson.

For an understanding of the issues presented on this appeal, there is no need to relate the testimony of other witnesses.

---

2. Subsequently in the course of investigating the claimed hijacking, the officers found small particles of red paint on one side of Green's station wagon, photographs of which were introduced in evidence. Also introduced were red paint samples scraped from both the station wagon and the truck.

## I.

Appellant's first issue reads:

"I. THE DISTRICT COURT ERRED IN INSTRUCTING THE JURY THAT A CONVICTION CAN REST ENTIRELY ON THE UN-CORROBORATED TESTIMONY OF AN ACCOMPLICE (R. 527) ESPECIALLY WHEN THAT TES-TIMONY IS COERCED AND PUR-CHASED."

■ Issue I is based upon a false premise. Green's conviction does not rest entirely on the uncorroborated testi-mony of his accomplices, Lindsey and Watson. To the contrary, Lindsey's testimony was strongly corroborated by the evidence of red paint found on Green's station wagon. See footnote 2, *supra.*

■ Further, in federal courts "there is no absolute rule of law preventing convictions on the testimony of ac-complices if juries believe them." Cam-inetti v. United States, 1917, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442. See also a long line of Fifth Circuit cases, in-cluding Patterson v. United States, 1969, 413 F.2d 1001, 1003, and Stewart v. Unit-ed States, 1969, 412 F.2d 818, 819, n. 1, cited on page 3 of appellee's brief.[3]

## II.

Appellant's second issue reads:

"II. THE DISTRICT COURT ER-RED IN OVERRULING DEFEND-ANT'S OBJECTION TO THE COURT'S ORAL CHARGE CON-CERNING UNCORROBORATED ACCOMPLICE TESTIMONY MADE ON THE GROUND THAT THE ALABAMA RULE SHOULD

APPLY TO A FEDERAL COURT SETTING [sic] IN ALABAMA."

■ Issue II evinces a complete mis-conception of the law of evidence to be applied in federal criminal cases. In federal criminal cases the sufficiency of the evidence to sustain a verdict of guilt,[4] like the admissibility of evidence, is governed by a uniform law, and state rules are not applicable.[5]

## III.

Appellant's third issue reads:

"III. THE DISTRICT COURT ERRED IN REFUSING DEFEND-ANT'S REQUEST FOR AN AC-QUITTAL IN THAT THE EVI-DENCE, WHICH SHOWED THAT LITTLE MORE THAN A CON-VERSATION OCCURRED CON-CERNING THIS WHISKEY IN THE SOUTHERN DISTRICT OF ALABAMA, FATALLY VARIED FROM THE INDICTMENT, WHICH CHARGED THE DE-FENDANT WITH 'STEALING AND TAKING AWAY FROM A MOTOR TRUCK' WITHIN THE SOUTHERN DISTRICT OF ALA-BAMA."

■ Commission of the crime of theft of the cargo and also of the truck was completed at the latest when the two vehicles stopped in Alabama, where Green, his son, and Lindsey examined the bill of lading, agreed to drive to the next stop before opening the truck, and Green's son got out of the station wagon and into the truck. When con-sidered in connection with the earlier agreement to stage the false hijacking, it is clear that by that time Green and

---

3. It may also be noted that to prevent pos-sible injustice, the district court correct-ly charged the jury that testimony of an alleged accomplice should be received with caution and carefully scrutinized in order to determine whether or not he may have falsely testified because of his per-sonal interest in the case.

4. *See* Riggs v. United States, 5 Cir. 1960, 280 F.2d 949.

5. *See* Oberg v. United States, 5 Cir. 1965, 353 F.2d 204, 206; 2 Wright, Federal Practice & Procedure § 4021; Rule 26, Fed.R.Crim.P. and the Advisory Com-mittee Note to that rule.

his accomplices had taken control of both the shipment and the truck.

■■ In the phrase "did steal, take, and carry away from a motor truck," the indictment was tracking the language of the statute, 18 U.S.C. § 659. While penal statutes are to be strictly construed, the courts are not required to abandon common sense. *See* United States v. Brown, 1948, 333 U.S. 18, 68 S.Ct. 376, 92 L.Ed. 442. The purpose of 18 U.S.C. § 659 is to protect interstate shipments. Stealing the truck with its contents is most certainly violative of the statute which proscribes the theft of the contents. The terms of the statute evince Congress' intent to give it broad application so that venue cannot be easily defeated:

> "The offense shall be deemed to have been committed not only in the district where the violation first occurred, but also in any district in which the defendant may have taken or been in possession of the said money, baggage, goods, or chattels."

The highly technical interpretation of the statute for which Green's counsel argues is contrary to the Second Circuit's construction of the present statute and of its predecessor.[6]

### IV.

Appellant's fourth issue reads:

"IV. THE DISTRICT COURT ERRED IN NOT GRANTING DEFENDANT'S MOTION TO SUPPRESS THE EVIDENCE ON THE GROUND THAT THE WITNESS WATSON'S PHOTOGRAPHIC IDENTIFICATION OF DEFENDANT WAS TAINTED UNDER THE SIMMONS' TEST."[7]

■■ This circuit has had occasion in other cases[8] to discuss and apply Simmons v. United States, n. 7 *supra,* and there appears no need for further elaboration in the present case. Referring to the procedure suggested in United States v. Sutherland, n. 8 *supra,*[9]

---

6. United States v. Padilla, 2 Cir. 1967, 374 F.2d 782, 784–785; United States v. De Normand, 2 Cir. 1945, 149 F.2d 622, 623, 624, cert. denied, 1945, 326 U.S. 756, 66 S.Ct. 89, 90 L.Ed. 454.

7. "The Simmons' Test" has reference to Simmons v. United States, 1968, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247. The contention as to the coercion of Watson's testimony is not strictly within the bounds of appellant's Issue IV as framed. Nonetheless, we have carefully considered that contention. We hold that the district court did not abuse its discretion in permitting Watson to testify after the United States Attorney had talked to him.

The writer, speaking for himself alone, must confess to a dim view of plea bargaining in general, and a hope for some day, even in the distant future, when judges rather than prosecutors will be in control of the disposition of criminal cases. *See* Shelton v. United States, 5 Cir. 1957, 242 F.2d 101, vacated on rehearing en banc, 246 F.2d 571, reversed, 356 U.S. 26, 78 S.Ct. 563, 2 L.Ed.2d 579 (1958). A better purpose may be served by a bargain with an accused for his immunity in exchange for his supposedly truthful testimony against an accomplice. When such a bargain is reached, a jury can best determine the actual truthfulness of the testimony from the bargaining process itself candidly laid before the jury, as was done in this case.

8. Barber v. United States, 5 Cir. 1969, 412 F.2d 775; United States v. Hughes, 5 Cir. 1969, 418 F.2d 1222; United States v. Ballard, 5 Cir. 1970, 423 F.2d 127; United States v. Sutherland, 5 Cir. 1970, 428 F.2d 1152; United States v. Agius, 5 Cir. 1970, 429 F.2d 28.

9. "Prior to offering the in-court identification before the jury, the trial judge should be accorded an opportunity out of the presence of the jury to determine if the picture spread in the particular case was impermissibly suggestive either in the photographs used or the manner or number of times they are displayed. If the judge makes such a determination, he then should determine if the impermissibly suggestive picture spread gives rise to a 'likelihood of irreparable misidentification.' If both elements are found, *Simmons* [390 U.S. 377], 88 S.Ct. 967, 19 L.Ed.2d 1247, prohibits the use of the in-court identification. However, if the judge does not find as a matter of law both that the picture spread was impermissibly suggestive *and* that there

the picture spread in this case was not intended to be suggestive but may possibly have had that effect. Conceding arguendo an impermissibly suggestive picture spread, that occurred within a week after Watson met with the man sought to be identified. Watson responded to the court's inquiry that he had an independent recollection of the man he saw on that occasion and could have identified Green as that man without the mental pictures of the photographs. The court did not err in holding that the Government's evidence met the test of Simmons v. United States, *supra*.

Finding no reversible error, the judgment is

Affirmed.

is a substantial likelihood of irreparable misidentification, the in-court identification may be put before the jury." United States v. Sutherland, 428 F.2d at 1155.