UNITED STATES of America,
Appellant,

v.

Phillip SIMS, aka Phillip Simon,
Appellee.

No. 15427.

United States Court of Appeals,
Fourth Circuit.

Argued May 3, 1971.

Decided Oct. 22, 1971.

Paul C. Camilletti, U. S. Atty., for appellant.

John Marshall, III, for appellee.

Before BRYAN, WINTER and BUTZNER, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

The suppression by the District Court of an automatic pistol, ammunition and an attache case containing several thousand dollars, taken without a warrant from the person of Phillip Sims at a West Virginia airport in February 1970, and intended to be used in his prosecution for transporting stolen property interstate, in violation of 18 U.S.C. § 2314, is now appealed by the Government, 18 U.S.C. § 3731. We hold the appeal good.

The essential facts are carried in the agreed statement:

"At approximately 3:20 o'clock, p. m., on February 27, 1970, West Virginia law enforcement officers received an anonymous telephone call relating that the caller, who was not a known informant, had been forced at gun point to drive an unidentified individual to the Ohio County Airport, in Brooke County, West Virginia. The caller described the suspect as a negro male, armed, wearing a trench coat, carrying a black attache case, and wearing dark glasses. Shortly thereafter, police received a telephone call from an official of the Ohio County Airport who related that he had received a similar anonymous telephone call and that an individual answering the description of the suspect was, in fact, sitting in the waiting room of the Ohio County Airport. Two local law enforcement officers, being Corporal Charles Kyer, of the West Virginia State Police, and Deputy Sheriff

John Bado, Brooke County Sheriff's Department, proceeded to the Ohio County Airport and observed the defendant Sims, who answered the description of the suspect, in the waiting room. The officers approached Sims, identified themselves, and asked Sims to stand up.

\*   \*   \*   \*   \*   \*

"Defendant had refused to talk or identify himself in any manner whatsoever. A search of his person revealed a .25 caliber automatic pistol and ammunition for same.

"The gun and ammunition were seized and Sims was arrested without warrant for violation of the West Virginia Concealed Weapon Law. (West Virginia Code: ch. 61, art. 7, sec. 1). Also seized at the time of arrest was a black attache case belonging to defendant. Defendant's presence at the airport waiting room is explained by the fact that he had just purchased a one-way ticket from Wheeling to Pittsburgh, Pennsylvania, on Keystone Airlines 4:00 o'clock flight that day.

"Following his arrest, defendant was taken to the Brooke County, West Virginia, Prosecuting Attorney's office, where a Social Security Card bearing the name 'Phillip Simon' was found among his effects, and ultimately to the Brooke County Jail for booking in connection with arrest.

\*   \*   \*   \*   \*   \*

"During this procedure, the attache case was not examined. \* \* \* In any event, defendant had still not been identified and had refused to submit to fingerprinting. The officers opened the attache case [at the police station with Sims present] and discovered therein a large sum of currency, some of which was wrapped with money wrappers bearing the inscription 'Dayton Postal Employees Credit Union, Inc.'. Investigation with authorities in Dayton, Ohio, revealed that the Dayton Postal Employees Credit Union was the subject of an armed robbery on the morning of February 27, 1970. An audit of the cash in the at-tache case determined that it amounted to Nine Thousand One Hundred Twenty-Five Dollars ($9,125.00). The attache case and cash were then seized by the officers."

The testimony of one of the officers enlarged upon this stipulation to this extent:

"I proceeded directly straight ahead and was met by one of the employees of the airport that pointed to the subject seated at the table and said, 'that is the man.' "

\*   \*   \*   \*   \*   \*

"Q  Would you tell us what you did following that?

"A  Yes, sir. As soon as he pointed out the subject to me, I proceeded to confront the man and asked him to arise from his seat, which he did and we could notice that he was wearing a field type trench coat and had a field type field jacket, Army or Air Force coat that had the flap pockets in the front and I noticed *there were two bulges on each side of his jacket.* (Accent added.)

"He was padded and there was found two boxes of .25 caliber ammunition; one box in each one of the pockets."

The District Court rested decision on the conclusion that since there was no search warrant, the seizure of this evidence was illegal unless incident to lawful arrest. Under the West Virginia statute, law enforcement officers can arrest without a warrant only for criminal acts "committed in their presence". W. Va.Code § 6291a. [9]. Sims was arrested for carrying an unlicensed firearm, a misdemeanor, W.Va.Code § 6043. [1]. But the trial court held that no crime had been committed at the time of the seizure because the weapon was not visible to the officer—and hence not in his presence—until the search and seizure, citing State v. Massie, 95 W.Va. 233, 120 S.E. 514 (1923). The rulings of the District Court adhered to State law.

■  This was error. Federal law is the exclusive judge of the validity of a

search and seizure in a Federal prosecution. Elkins v. United States, 364 U.S. 206, 207, 223, 224, 80 S.Ct. 1437, 4 L.Ed. 2d 1669 (1960), reaffirmed in Mapp v. Ohio, 367 U.S. 643, 660, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). In kindred circumstances Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), approved officer conduct similar to that of the police here.

Notably, in *Terry*, as here asserted, there was no crime in esse or in commission in the presence of the officer, and no probable cause for an arrest, before the search was begun. The policeman became suspicious of three men whom he had observed peering into a nearby store window. They paced back and forth and then occasionally stopped to confer with each other. This stealthy reconnaissance prompted the seasoned officer to act quickly. He advanced upon the trio, identified himself and proceeded to search them for weapons, never reaching beneath their outer garments until a weapon was felt. Of this occurrence the Court observed that

> " * * * a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior *even though there is no probable cause to make an arrest.*" Id. at 22, 88 S.Ct. at 1880. (Accent added.)

■ Given the instant facts and using the *Terry* standard, there can be no doubt that the officer was faultless in searching Sims immediately for weapons. Again *Terry*, supra, speaks to the point:

> "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact

carrying a weapon and to neutralize the threat of physical harm." Id. at 24, 88 S.Ct. at 1881.

Sims argues, however, that the opening of the attaché case was against the law. Apart from the weapons, he maintains that it could not be rightfully searched without a warrant. We reject this contention, again relying on the words of *Terry*, supra, 392 U.S. 1, 88 S. Ct. 1868 (1968):

> " * * * in determining whether the seizure and search were 'unreasonable' our inquiry is a dual one— whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Id. at 19–20, 88 S.Ct. at 1879.

We conclude that the telephone calls and the defendant's resemblance to the description of the assailant justified the suspicion of the investigating officers and the ensuing search of the defendant's person for weapons. The seizure of the attaché case and its opening, we think, were "reasonably related in scope" to the seizure of the weapons.

The officers' concern lest the luggage contain an explosive device was dictated by the telephone tips—not a fantastic suspicion in the age of skyjackers. Removal of the brief case to the station house before its search was a precautionary step to limit the possibility of harm to the public at the airport and to the officers. We believe that *Terry* cloaked the officers with authority "to take necessary measures to determine whether the person * * * [was] in fact carrying a weapon and to neutralize the threat of physical harm." Id. at 24, 88 S.Ct. at 1881.

The search of the attaché case and the seizure of the money were wholly without constitutional infirmity, and they were clearly admissible in evidence.

Reversed.