**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Theodore Ray MELANCON, Defendant-
Appellant.**

**No. 71-3235.**

United States Court of Appeals,
Fifth Circuit.

June 13, 1972.

Rehearing Denied July 21, 1972.

Jay E. Loeb, Michael H. Terry, John C. Fauvre, Richard M. Pearl, Atlanta, Ga., for plaintiffs-appellants.

John W. Stokes, Jr., U. S. Atty., Atlanta, Ga., Paul Merlin, Chief of Litigation, Soc. Security Div., Dept. of H. E. & W., Harland F. Leathers, David Epstein, Kathryn H. Baldwin, Judith S. Feigin, Attys., L. Patrick Gray, III, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before WISDOM, THORNBERRY and GODBOLD, Circuit Judges.

Dennis R. Whalen, Baton Rouge, La., for defendant-appellant.

Gerald J. Gallinghouse, U. S. Atty., Robert S. Leake, Asst. U. S. Atty., New Orleans, La., for plaintiff-appellee.

Before RIVES, COLEMAN and DYER, Circuit Judges.

COLEMAN, Circuit Judge:

Theodore R. Melancon was charged in a twelve count indictment with unlawful possession of firearms not registered to him in the National Firearms Registration and Transfer Record or not identified by serial numbers as required by part of the new Gun Control Act of 1968 (codified as 26 U.S.C., §§ 5801 through 5872), as amended October 22, 1968, Public Law 90–618, 82 Stat. 1213, which amended in toto the provisions of the National Firearms Act (codified as 26 U.S.C., §§ 5801 through 5862). 26 U.S.C., §§ 5861(d) and 5861(i).

Counts I, II, III, IV, VI, VIII, X and XII charged the appellant with knowingly and unlawfully possessing on or about February 11, 1971, one Russian PPsh Machine Pistol, Model M–1946, Caliber 7.62 mm; one Russian PPS Machine Pistol, Model M–1944, Caliber 7.62 mm; one Colt AR–15 Semi-Automatic rifle, SP–1, Caliber .223; one 50 mm Japanese Knee Mortar; ten military incendiary grenades, Model Nos. TH, AN–M–14; five military simulator grenades, Model M116A1; five military simulator ground burst explosive devices, Model Nos. M115A2, and six military 3.5 inch bazooka practice rockets, Model Nos.

M29A2, all in violation of 26 U.S.C., § 5861(d) which provides:

"Section 5861. Prohibited Acts.

"It shall be unlawful for any person—

* * * * * *

"(d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record.

* * * * * *"

Counts V, VII, IX and XI charged the appellant with knowingly and unlawfully possessing on or about February 11, 1971, ten military incendiary grenades, Model Nos. TH, AN–M–14; five military simulator grenades, Model M-116A1; five military simulator ground burst explosive devices, Model No. M115A2, and six military 3.5 inch bazooka practice rockets, Model No. M-29A2, all in violation of 26 U.S.C., § 5861(i) which provides:

"Section 5861. Prohibited Acts.

"It shall be unlawful for any person—

* * * * * *

"(i) to receive or possess a firearm which is not identified by a serial number as required by this chapter; or

* * * * * *"

At the request of the government, Count III was dismissed. The government conceded that the rifle described in Count III was a weapon which lawfully could be possessed in an unregistered state. After completion of the government's case, the District Court granted a judgment of acquittal, ex proprio motu, as to Counts V through XII. Thereafter, the District Court denied appellant's motion for a judgment of acquittal as to the remaining counts. Thus, Counts I, II and IV were left for the verdict of the jury.

The jury found Melancon not guilty on Count II [knowingly and unlawfully possessing one Russian Machine Pistol, Model M–1944, Caliber 7.62 mm]. Melancon was found guilty on Counts I and IV [knowingly and unlawfully possessing one Russian PPsh Machine Pistol, Model M–1946, Caliber 7.62 mm, and one Japanese Knee Mortar]. He was committed to the custody of the Attorney General for imprisonment for a period of three years with the provision that he be confined in a correctional institution for a period of six months and that the execution of the remainder of the sentence be suspended.

Appealing from his conviction and sentencing, appellant's appeal raises the following questions to be resolved by this Court:

I

Was the affidavit sworn to by the two Louisiana State Police Officers and upon which the issuance of the search warrant was based constitutionally defective under the Fourth Amendment to the United States Constitution in that such affidavit contained facts and circumstances insufficient to enable the judicial officer to find requisite probable cause to issue the search warrant?

II

Was the affidavit sworn to by the two Louisiana State Police Officers and upon which the issuance of the search warrant was based constitutionally defective under the Fourth Amendment to the United States Constitution in that such affidavit rested largely on hearsay information not satisfying the standards prescribed by the Supreme Court's decision?

III

Was the search warrant constitutionally defective and thus invalid in that it failed to describe the place to be searched with the degree of particularity required by the Fourth Amendment to the United States Constitution?

IV

Is there sufficient evidence in the record to sustain appellant's convic-

tion by jury for knowingly and unlawfully possessing one Russian PPsh Machine Pistol, Model M–1946, Caliber 7.62 mm in violation of 26 U.S.C., § 5861(d)?

V

Is there sufficient evidence in the record to sustain appellant's conviction by jury for knowingly and unlawfully possessing one Japanese Knee Mortar in violation of 26 U.S.C., § 5861(d)?

Questions I, II, and III arise from appellant's claim that it was error not to suppress all evidence flowing from the February 11, 1971, search of his residence. This claim is grounded on the argument that the search warrant issued as to his premises was invalid because it was based on a defective supporting affidavit sworn to by the two Louisiana State Police Officers and because it was constitutionally insufficient on its face.

On February 10, 1971, Special Investigator Charles Wernette of the Alcohol, Tobacco and Firearms Division of the Internal Revenue Service, United States Treasury Department, met John Edward Kirsch at a motel room in New Orleans, Louisiana, and purchased from him one unregistered M–2 automatic carbine, one unregistered pine-apple type fragmentation grenade, and a flame thrower. Following the purchase, Kirsch informed Agent Wernette that he had a friend in Baton Rouge that had additional weapons (including machine guns, hand grenades, and thermite grenades). At this point, Agent Wernette expressed his interest in purchasing such additional weapons, and thereafter accompanied Kirsch to Baton Rouge in Kirsch's pick-up.

Upon arrival in Baton Rouge, Kirsch and Agent Wernette went to the Bellemont Motel whereupon Kirsch made a telephone call to his friend. During the telephone conversation, Agent Wernette overheard Kirsch say, "Is this the Ted Melancon who works for the phone company?" After talking on the telephone

for approximately five minutes, Kirsch returned to Agent Wernette and informed him that he was going to his friend's house to pick up some additional weapons and some ammunition. Kirsch said that he would return in an hour and a half to two hours so Agent Wernette waited at the motel, having failed in his attempts to accompany Kirsch to his friend's house.

At approximately 8:30 to 8:45, Kirsch returned. Agent Wernette went to the vehicle and at this point, Kirsch showed Wernette a Russian machine pistol. Besides the Russian machine pistol located in the cabin of the pick-up truck, Wernette observed (in the bed of the truck) some 30 caliber carbine ammunition and some 7.62 ammunition for the Russian machine pistol.

During the return trip to New Orleans, the Russian machine pistol remained lying on the front floorboard of the pick-up truck. Upon arrival at a motel Wernette looked the weapon over, agreed on a purchase price, and paid for the weapon. As Kirsch was leaving the room, he was arrested by Investigators of the Alcohol, Tobacco, and Firearms Division of the Internal Revenue Service for selling an unregistered firearm.

After Kirsch's arrest, Wernette and other agents of the Alcohol, Tobacco, and Firearms Division of the Internal Revenue Service returned to Baton Rouge in search of the man telephoned by Kirsch in Wernette's presence. On February 11, 1971, they contacted two Louisiana State Police Officers, Captain Vidrine and Lieutenant Denison, and requested their assistance in locating someone named "Ted". The Internal Revenue Agents gave the two Louisiana State Police Officers the known facts connecting Ted with the sale of the unregistered firearm by Kirsch in the New Orleans motel room. The State Police Officers were also informed by the Internal Revenue Service Agents that part of Ted's phone number was known, that Ted was employed by the telephone company, and that he lived near Brusly,

Louisiana. Later at the Louisiana State Police Headquarters and upon the arrival of other agents of the Alcohol, Tobacco, and Firearms Division of the Internal Revenue Service, it was determined that the full name of Ted was Ted Melancon.

Possessing the knowledge that the man sought by the Internal Revenue Service Agents was named Ted Melancon and that he was employed by the telephone company, Lieutenant Denison called a security officer of the telephone company, and asked him if he knew of a Ted Melancon working for the telephone company. The response was affirmative. Thereafter, the officers were able to determine that Ted Melancon was Theodore R. Melancon, Route 2, Box 623, Port Allen, that he operated a gun shop known as Melancon's Guns, and that he held Federal Firearm License No. 72–1786.

Leaving the Louisiana State Police Headquarters, the Internal Revenue Agents and the two Louisiana State Police Officers proceeded to the West Baton Rouge Sheriff's Office to enlist the aid of the Deputy Sheriffs. Because Ted Melancon was a Special Deputy for the Parish of West Baton Rouge and had at one time sold ammunition to the Sheriff's Office, the Deputy Sheriffs present were found to be quite familiar with Ted Melancon and his residence. Based on the information supplied by the Deputy Sheriffs, the affidavit was changed by the insertion of the words "brick" and "including house trailers" so as to describe the property to be searched. None of the Deputies knew the R.F.D. box number of Melancon's residence, but they did know where his residence was located.

Lieutenant Denison then signed an affidavit for a search warrant.[1]

1. IN THE CRIMINAL DISTRICT COURT
PARISH OF WEST BATON ROUGE
STATE OF LOUISIANA
APPLICATION FOR AND SWORN PROOF OF PROBABLE CAUSE FOR THE ISSUANCE OF A SEARCH WARRANT

BEFORE ME, the undersigned Judge of the Criminal District Court, Parish of West Baton Rouge, State of Louisiana, personally came and appeared Captain Coleman Vidrine and Lt. Lee Denison, OF THE LOUISIANA STATE POLICE, who, upon being by me duly sworn depose(s) and say(s): THAT a search warrant should issue for the search of the following described (premises) (vehicles) and all other buildings and appurtenances located at Route 2, Box 623, Brusly, Louisiana, including house trailers, Street No. ____________, Apartment No. ________, No. of stories one, Structure Brick, Type of occupancy (Residence) (Commercial); for the purpose of seizing the following described property: *Full automatic submachinegun and/or grenades and parts to convert M–1 carbines to full automatic firearms.*

The reasons and facts for the request of this search warrant are: John Kirch was arrested for the sale of a submachinegun to an Alcohol, Tobacco and Firearms Treasury Agent on February 10, 1971 at 11:10 p. m. This firearms was purchased at the premises of Ted Melancon. The ATF Agent overheard Kirch ask over the telephone. "Is this the Ted Melancon that works for the phone company?" Tel Melancon at the above address works for the telephone company and holds Federal Firearms License No. 72–1786.

LT. LEE DENISON, BADGE NO.:________
LOUISIANA STATE POLICE

SWORN TO AND SUBSCRIBED BEFORE ME, THIS 11 DAY OF February, 1971.

Copies:
1 — *Judge signing warrant*
1 — District Attorney
1 — State Police Detective Bureau

DANIEL P. KIMBALL
CRIMINAL DISTRICT COURT, PARISH OF
West Baton Rouge, State of Louisiana
18th Jud. Dist.

Judge Daniel Kimball issued a search warrant.[2]

Pursuant to this warrant, on February 11, 1971, at 6:05 a. m., the search and seizure challenged by the appellant was conducted at his residence, Route 2, Box 622, Brusly, Louisiana.

First, we consider the appellant's contention that the search warrant was invalid under the Fourth Amendment to the United States Constitution because the supporting affidavit stated facts and circumstances insufficient to show probable cause.[3]

2. CRIMINAL DISTRICT COURT FOR THE PARISH OF WEST BATON ROUGE

STATE OF LOUISIANA
SEARCH WARRANT
ORDER OF SEARCH

TO: THE SUPERINTENDENT OF THE LOUISIANA STATE POLICE, AND/OR HIS DESIGNATED REPRESENTATIVE(S)

AFFIDAVIT(S) HAVING BEEN MADE BEFORE ME BY Capt. Coleman Vidrine and Lt. Lee Denison, of the Louisiana State Police, that he has good reason to believe that on or in the (premises) (person), (vehicle) located at Route 2, Box 623, Brusly, Louisiana, within the Parish of West Baton Rouge, State of Louisiana, as more fully described in the application for this warrant, there is now being concealed certain property, namely, a full automatic submachinegun and/or parts to convert M–1 carbines to full automatic firearms, which said property constitutes evidence of the commission of a crime or offense against the laws of the State of Louisiana set forth in the Louisiana Revised Statutes, and as I am satisfied from the affidavit(s) submitted in support of the application for this warrant that there is probable cause to believe that the aforesaid property is being concealed on the (premises) (person) (vehicle) above described, and that the aforesaid grounds for the issuance of this search warrant exist;

YOU ARE HEREBY ORDERED to search forthwith the aforesaid (premises) (person) (vehicle) for the property specified, serving this search warrant and making the search, and if the property be found there, to seize it, leaving a copy of this warrant and a receipt for the property seized, to make your written return on this warrant including a written inventory of the property seized, and to bring the said seized property before me within ten (10) days of this date as required by law.

YOU ARE AUTHORIZED to execute this warrant and to make this search during the daytime or the nightime and if the property herein described be found on the (premises) (person) (vehicle) herein described to seize said property in accordance with law.

YOU ARE (ARE NOT) AUTHORIZED to execute this warrant and to make this search on a Sunday and if the property herein described be found on the (premises) (person) (vehicle) herein describd to seize said property in accordance with law.

Port Allen, LOUISIANA, This 11 DAY OF February, 1971.

Copies:

1 — Person upon whom warrant is served
1 — Judge signing warrant
1 — District Attorney
1 — State Police Det. Bureau
1 — 2nd copy (when making return) to Judge who signed warrant

DANIEL P. KIMBALL
JUDGE, Criminal District Court,
Section A, Parish of West Baton Rouge
State of Louisiana
18th Jud. Dist.

3. The Fourth Amendment to the Constitution of the United States provides:

"The right of the people to be secure in their persons, houses, papers, and ef-

It is said that "there is nothing in the affidavit that justifies more than a suspicion that Melancon had in his possession the various items listed in the warrant itself" and that "the warrant itself borders on being a 'general warrant'."

The affidavit for the search warrant stated:

> "The reasons and facts for the request of this search warrant are: John Kirsch was arrested for the sale of a submachinegun to an Alcohol, Tobacco, and Firearms Treasury Agent on February 10, 1971 at 11:10 p. m. This firearm was purchased at the premises of Ted Melancon. The ATF agent overheard Kirsch ask over the telephone, 'Is this the Ted Melancon that works for the phone company?' Ted Melancon at the above address works for the telephone company and holds Federal Firearms License No. 72–1786."

Recently, the Supreme Court in Coolidge v. New Hampshire, 403 U.S. 443, 449, 91 S.Ct. 2022, 2029, 29 L.Ed.2d 564 (1971) pointed out that "the classic statement of the policy underlying the warrant requirement of the Fourth Amendment is that of Mr. Justice Jackson, writing for the Court in Johnson v. United States, 333 U.S. 10, 13–14, 68 S. Ct. 367, 369, 92 L.Ed. 436 (1964)". Therein, Justice Jackson said:

> "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. * * *. When the right of privacy must reasonably yield to the right to search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent."

Under the constitutional safeguards of the Fourth Amendment, a judicial officer "may not properly issue a warrant to search a private dwelling unless he can find probable cause therefor from facts and circumstances presented to him under oath or affirmation". Nathanson v. United States, 290 U.S. 41, 47, 54 S.Ct. 11, 13, 78 L.Ed. 159 (1933). Probable cause is deemed to exist "where the facts and circumstances within the affiant's knowledge, and of which he has reasonable trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed". United States v. Rich, 5 Cir., 1969, 407 F.2d 934, 936 cert. denied, 395 U.S. 922, 89 S.Ct. 1775, 23 L.Ed.2d 239.

Only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause, Beck v. Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964); affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, McCray v. Illinois, 386 U.S. 300, 311, 87 S.Ct. 1056, 1062, 18 L.Ed.2d 62 (1967); in judging probable cause, issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense. United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965); and their determination of

fects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or Affirmation, and particularly describing the place to be searched, and the person or things to be seized."

probable cause should be paid great deference by reviewing courts, Jones v. United States, 362 U.S. 257, 270–271, 80 S.Ct. 725, 734–736, 4 L.Ed.2d 697 (1960); Spinelli v. United States, 393 U.S. 410, 419, 89 S.Ct. 584, 590–591, 21 L.Ed.2d 637 (1969). We, as a reviewing court, may consider only information brought to the issuing judicial officer's attention, Giordenello v. United States, 357 U.S. 480, 486, 78 S.Ct. 1245, 1250, 2 L.Ed.2d 1503 (1958); Aguilar v. Texas, 378 U.S. 108, 109, 84 S.Ct. 1509, 12 L. Ed.2d 723 (1964) [Footnote 1].

The Supreme Court in Whiteley v. Warden, Wyoming State Penitentiary, 1971, 401 U.S. 560, 564, 91 S.Ct. 1031, 1035, 28 L.Ed.2d 306, emphasized that its prior decisions

> "concerning Fourth Amendment probable cause requirements before a warrant for either arrest or search can issue require that the judicial officer issuing such a warrant be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant. Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958)."

> "(A)ffidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of criminal investigation. Technical requirements of elaborate specificity one exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." United States v. Ventresca, *supra*.

Accord, United States v. Harris, 1971, 403 U.S. 573, 577, 91 S.Ct. 2075, 29 L. Ed.2d 723.

■ We are of the opinion that the affidavit for the search warrant complied with the above standards.

The appellant argues, however, that the affidavit based upon information received from the informant (Wernette) could not support a finding of probable cause because it was based largely on hearsay and was thus defective under the two pronged test formulated in Aguilar v. Texas, *supra*, and Spinelli v. United States, *supra*. Appellant's counsel complains that the alleged purchase by Kirsch rested on the hearsay statements of that individual, hence no facts to support Wernette's conclusion that a purchase was so made were presented in the affidavit to the issuing judicial officer.

■ It is well settled that an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant. Jones v. United States, *supra*; Aguilar v. Texas, *supra*; Spinelli v. United States, *supra*.

In United States v. Fuller, 4 Cir., 1971, 441 F.2d 755, 758–759, cert. denied, 404 U.S. 830, 92 S.Ct. 74, 30 L.Ed. 2d 59 (1971), the Fourth Circuit set forth the Supreme Court's standards for evaluating the sufficiency of an affidavit for a search warrant based on information supplied by an unidentified informant.

> "A magistrate issuing a search warrant may rely on the hearsay information provided by an unidentified informant if 'a substantial basis for crediting the hearsay is presented.' Jones v. United States, 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960). In order to show a substantial basis for crediting the hearsay, the affidavit must pass the two-pronged test of Aguilar v. Texas, 378

U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The magistrate must be informed of (1) the underlying circumstances on which the affiant concludes that the informant is credible and (2) the underlying circumstances on which the informant based his conclusion that the person whose residence is to be searched is engaged in criminal activity. If the informer's tip is found inadequate under *Aguilar*, the magistrate may yet find probable cause to believe the tip if it can 'fairly be said that the tip * * * when * * * corroborated by independent sources, is as trustworthy as a tip which would pass Aguilar's tests without independent corroboration'. Spinelli v. United States, 393 U.S. 410, 415, 89 S.Ct. 584, 588, 21 L.Ed.2d 637 (1969)."

Looking at the affidavit on its face, it is clear that the first test of *Aguilar* is satisfied, namely, the requirement that the affidavit recite facts and circumstances which led the affiant to conclude that the informer was reliable. As heretofore mentioned, a reasonable and commonsense reading of the affidavit reveals that it contains information supplied the affiant by an Agent of the Alcohol, Tobacco and Firearms Division of the Internal Revenue Service rather than the usual unnamed or unidentified informer. We see no reason to discredit information passed from one law enforcement official to another before being offered to a magistrate as grounds for probable cause. Instead, it has been held that "(w)here the hearsay evidence has been personally observed by federal officers and communicated directly to [this] affiant, this may constitute a substantial basis for crediting the hearsay". United States v. Plemmons, 6 Cir., 1964, 336 F.2d 731, 734. Here, the information supplied the affiants by the Agent of the Alcohol, Tobacco and Firearms Division of the Internal Revenue Service recounted personal and recent observations made during criminal investigation. In addition, the affiants verified appellant's employment, address, description of premises, and firearms dealings. Thus, we are convinced that the affiant's affidavit in the instant case was based on information derived from a credible or reliable source.

Similarly, the requirement that the magistrate be informed of the underlying circumstances on which the informant (Wernette) based his conclusion that the person whose residence is to be searched is engaged in criminal activity is also satisfied. The underlying facts and circumstances from which the informant drew his conclusions are briefly delineated in the affidavit and show that during the informer's investigation leading to the arrest of John Kirsch for the sale of one submachinegun to Wernette, he overheard a telephone conversation between Kirsch and the appellant wherein Kirsch said: "Is this the Ted Melancon that works for the phone company?" Subsequent investigation by the government agent and the two Louisiana State Police Officers, affiants to the affidavit, verified that Ted Melancon worked for the telephone company and held Federal Firearms License No. 72–1786. Clearly, these were sufficient facts to enable a magistrate to determine that the informant was justified in concluding that the presence of illegal firearms on appellant's premises was a probability.

The validity of the search warrant on its face is also challenged. Relying on Louisiana Supreme Court decisions in State v. Chargois, 245 La. 647, 160 So.2d 231 (1964), and State v. Lee, 247 La. 553, 172 So.2d 678 (1965), appellant contends that the search warrant was void since it failed to describe the premises to be searched with sufficient particularity to satisfy state and federal constitutional requirements. In effect, appellant argues that we should, in this federal prosecution, adhere to rulings of the Supreme Court of Louisiana to test the validity of the search warrant used to search his premises. Appellant points to the Supreme Court's decision in Elkins v. United States, 364 U.S. 206, 80 S.Ct.

1437, 4 L.Ed.2d 1669 (1960), as being persuasive on this point.

In *Elkins*, the Supreme Court held "that evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial". After so concluding, the Supreme Court said:

> "In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. *The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.*" [Emphasis added]. 364 U.S. at 223–224, 80 S.Ct. at 1447.

See, also, United States v. Alberty, 10 Cir., 1971, 448 F.2d 706, where the Tenth Circuit, relying on *Elkins*, in effect held that in determining the admissibility of evidence in federal prosecution for unlawful possession of firearms, which evidence was the product of search and seizure of defendant's automobile following his illegal arrest by city police officers, federal law, rather than state law, applied.

Moreover, Rule 26, Federal Rules of Criminal Procedure, provides in part:

> "* * * The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

"Federal law is the exclusive judge of the validity of a search and seizure in a federal prosecution," United States v. Sims, 4 Cir., 1971, 450 F.2d 261, 262, citing Elkins v. United States, *supra*, reaffirmed in Mapp v. Ohio, 367 U.S. 643, 660, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). See United States v. Green, 5 Cir., 1971, 446 F.2d 1169, 1172. "This being a federal prosecution, there would be no occasion to look to the state law for a rule of evidence merely because it might be favored in the courts of a particular state," Oberg v. United States, 5 Cir., 1965, 353 F.2d 204, 206. Therefore, appellant's challenge to the validity of the search warrant must be decided in accordance with federal standards.

Melancon says that the search warrant did not sufficiently describe the premises to be searched since it specified the "premises located at Route 2, Box 623, Brusly, Louisiana".

Our review of the record reveals that appellant's motion to suppress is surrounded by the following pertinent facts:

1. Appellant is the owner of both parcels of land located at Route 2, Box 622, Brusly, Louisiana, and at Route 2, Box 623, Brusly, Louisiana. The legal description of these parcels of property are recorded separately.
2. Appellant's business establishment for the sale of firearms is adjacent to his residence and is located at Route 2, Box 623, Brusly, Louisiana. This parcel of property was purchased on September 14, 1966, and house trailers are contained thereon.
3. Appellant's residence, a one-story brick structure, is located at Route 2, Box 622, Brusly, Louisiana. This parcel of property was purchased on October 29, 1970. Importantly, the mail box in front of his residence reads:

   "Richard St. Romaine

   Route 2, Box 622

   Port Allen, Louisiana".
4. No fence separates appellant's residence from his business establishment, and there is a pathway

worn between appellant's residence and his business establishment.

5. The official records of appellant's employer, South Central Bell, showed appellant's residence address as being Route 2, Box 623.
6. Appellant in his 1971 application for a federal firearms license listed as his business and residence address Route 2, Box 623. No distinction was made in such application between home and business.
7. Appellant receives his personal mail at his residence address, Route 2, Box 622. However, sometimes he does receive both his personal and business mail at Route 2, Box 623.
8. On February 11, 1971, a search warrant to search the premises (including a one-story brick structure and house trailers) located at Route 2, Box 623, Brusly, Louisiana, was secured by the two Louisiana State Police Officers, Captain Vidrine and Lieutenant Denison.
9. On February 11, 1971, pursuant to the search warrant, a search was conducted by the officers of the Louisiana State Police and the Agents of the Alcohol, Tobacco and Firearms Division of the Internal Revenue Service at appellant's residence, a one-story brick structure located at Route 2, Box 622.

In denying appellant's motion to suppress based on the claimed error in the "post office box number" description of the premises to be searched, the District Judge said:

"The motion to suppress will be denied, the reason being that it is the opinion of this Court that the affidavit filed in this case by the police officer is sufficient. The question of the difference of post office box number, is totally and completely immaterial in this case. First of all even on the application for license for firearm permit, filed by the defendant, he gave both his house number and his office number as Post Office Box 623—Route 2, Box 623—and that was listed as both his home and his office. As a matter of fact, if they were trying to search the premises belonging to a Mr. Ted Melancon, they certainly would not search the premises at box 622, because box 622 didn't even have Mr. Melancon's name on it. That was the box of somebody else. That wasn't even the box of Mr. Melancon. It happened he bought the house, but it had someone else's name on it, and anyone looking at it certainly wouldn't think that was Mr. Melancon's mail box; that is quite sure. And the affidavit and the application for search warrant, did, I hold, list the proper box number and it is properly described as a brick building—which was the only brick building on the premises—and I don't think there is any reason to divide the premises in two lots when the physical aspect of this whole set-up showed it was clearly one establishment with a worn pathway between the two and obviously Mr. Melancon lived in one and worked in the other; and it described it as a brick-type residence, and also included house trailers which were on the adjoining lot; and both the house trailers and the house were searched."

The Fourth Amendment "specifies that a search warrant must particularly describe the place to be searched". United States v. Pisano, D.C., N.Y., 1961, 191 F.Supp. 861, 863.

In Steele v. United States (No. 1), 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed. 757 (1925), the Supreme Court announced the test generally recognized as controlling in judging the sufficiency of a description in a search warrant of the premises to be searched. The Supreme Court said:

"It is enough if the description is such that the officers with a search

warrant can, with reasonable effort ascertain and identify the place intended."

In interpreting this test announced by the Supreme Court in *Steele,* Judge Mansfield stated in United States v. Gomez, D.C., N.Y., 1967, 42 F.R.D. 347:

"The standard for determining whether a search warrant complies with Constitutional requirements is one of practical accuracy rather than technical nicety."

We find equally applicable to any decision on the merits of appellant's present contention the recent decision of the District Court in United States v. Sklaroff, D.C., Fla., 1971, 323 F.Supp. 296, 320–321, wherein that Court discussed numerous court decisions upholding searches and seizures authorized by search warrants with errors in a portion of the description of the premises to be searched, such as Hanger v. United States, 8 Cir., 1968, 398 F.2d 91, cert. denied, 393 U.S. 1119, 89 S.Ct. 995, 22 L.Ed.2d 124; United States v. Contee, D.C., D.C., 1959, 170 F.Supp. 26; United States v. Joseph, E.D.Pa., 1959, 174 F.Supp. 539, affirmed, 3 Cir., 278 F.2d 504, cert. denied, 364 U.S. 823, 81 S.Ct. 59, 5 L.Ed.2d 52; United States v. Pisano, *supra;* and United States v. Goodman, D.C., Ind., 1970, 312 F.Supp. 556.

Following its discussion of the preceding cases, the District Court in *Sklaroff* said:

"The foregoing decisions illustrate the principle that the determining factor (a)s to whether a search warrant describes the premises to be searched with sufficient particularity is not whether the description given is technically accurate in every detail but rather whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched which is not the one intended to be searched under the search warrant."

Thus, an error in a description is not automatically fatal to the validity of a search warrant, United States v. DePugh, 10 Cir., 1971, 452 F.2d 915, 920.

We hold that the description of Melancon's property provides no basis for the invalidation of the search.

Relying on United States v. Williams, 9 Cir., 1970, 427 F.2d 1031, cert. denied, 400 U.S. 909, 91 S.Ct. 154, 27 L.Ed.2d 149, appellant contends that the evidence was insufficient to show that the Russian PPsh Machine Pistol, Model M–1944, Caliber 7.62 mm, was in fact a firearm "which shoots, is designed to shoot, or can be readily restored to shoot, without manual reloading, by a single function of the trigger". More specifically, appellant contends that the government failed to prove that the firearm in Count I was fully automatic since the government only test-fired the firearm singleshot. This contention apparently arises from the following testimony at trial given by Lieutenant Denison of the Louisiana State Police.

"Q. Have you had occasion to fire this weapon?

"A. Yes, sir, I did.

* * * * * *

"Q. How did you fire it?

"A. Well, we pulled the bolt back, put a cartridge in it and then put the muzzle of the gun in the bullet box and fired it.

"Q. Did you make any observations about whether this weapon was capable of firing automatic or not?

"A. No, sir, I did not have a magazine to determine if it could fire fully automatic or not."

In United States v. Williams, *supra,* appellant had contended also "that the evidence was insufficient to support the verdict in that it did not show that the Spitfire was a machine gun". The Ninth Circuit disagreed and thereafter said:

"There was testimony from Richard F. Johnson and Paul Westenberger,

both employed by the Alcohol, Tobacco and Firearms Division, to the effect that the Spitfire could be fired, and had been fired, automatically."

Even so, the proof as to the Russian machine pistol showed without contradiction that it would fire and that only the magazine was missing. An inference on the part of the jury that with the magazine the weapon would become fully automatic is amply justified.[4] See Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680. Moreover, in the words of the statute, "the frame * * * of such weapon" was clearly present. Added to this is the testimony of Agent Reynaud that the weapon was a Russian machinegun.

26 U.S.C., § 5845(a)(8) defines a "Firearm" as including a "destructive device". "Destructive Device" is defined in 26 U.S.C., § 5845(f), in pertinent part, as follows:

> "(f) Destructive Device.—
>
> "The term 'destructive device' means * * * (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary or his delegate finds is generally recognized as particularly suitable for sporting purposes. * * * *".

Claiming that no government witness had been able to testify that projectiles for the Japanese Knee Mortar existed or had existed since the defeat of the Japanese in 1945, and claiming that in the absence of a projectile the Japanese Knee Mortar is not a firearm or destructive device that will expel a projectile, appellant lastly contends that the government failed to prove that the Japanese Knee Mortar was a firearm within the purview of 26 U.S.C., § 5861(d), and thus there is insufficient evidence in the record to sustain his conviction by jury as to Count IV of the indictment. Count IV reads:

> "That on or about February 11, 1971, in the Baton Rouge Division of the Eastern District of Louisiana, Theodore R. Melancon knowingly and unlawfully did possess a firearm as defined by Title 26, United States Code, Section 5845(a), to-wit: one 50 mm Japanese Knee Mortar, having a barrel length of 10 inches and an overall length of 24 inches, and bearing Serial No. 15760, which firearm was not registered to him in the National Firearms Registration and Transfer Record; all in violation of Title 26, United States Code, Section 5861(d)."

Since in our opinion the Japanese Knee Mortar should be considered under 26 U.S.C., § 5861(d) as a firearm (or destructive device) "* * * which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter * * *", the specific question is:

> "Did the government prove that the Japanese Knee Mortar was a firearm (or destructive device) within the purview of 26 U.S.C., § 5861(d) notwithstanding the lack of evidence in the record revealing the existence of projectiles for use in the Japanese Knee Mortar?"

4. 26 U.S.C., § 5845(b) provides:

* * * * *

"(b) Machinegun.—

"The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any combination of parts designed and intended for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

At trial, Neal Railey, Special Investigator for the Alcohol, Tobacco and Firearms Division of the Internal Revenue Service, testified that he participated in the execution of the search warrant relating to appellant's premises, that he found the Japanese Knee Mortar during the search, that the diameter of the bore of the Japanese Knee Mortar was two inches, and that the Japanese Knee Mortar in its present condition was capable of being fired. This is enough to prove that the Japanese Knee Mortar was a firearm (or destructive device) under the terms of the statute. It is true that Railey did not know of the existence of a projectile for use in the Japanese Knee Mortar, but the Japanese Knee Mortar was nevertheless a firearm (or destructive device) capable of being fired and was possessed by Melancon in an unregistered state. Within the plain words of the statute, the weapon was there. A lack of appropriate ammunition could not and did not render the weapon non-existent.

The judgment of the District Court is Affirmed.