**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Louis M. DARENSBOURG,**
**Defendant-Appellee.**

No. 74–2313.

United States Court of Appeals,
Fifth Circuit.

Oct. 10, 1975.

As Modified on Denial of Rehearing and Rehearing En Banc Dec. 4, 1975.
See 524 F.2d 233.

**986**

Douglas M. Gonzales, U. S. Atty., Robert S. Leake, Asst. U. S. Atty., Baton Rouge, La., for plaintiff-appellant.

Alex W. Wall, Baton Rouge, La., for defendant-appellee.

Before GODBOLD, Circuit Judge, SKELTON, Associate Judge,* and GEE, Circuit Judge.

GEE, Circuit Judge:

This hard but simple case concerns the validity of a state search warrant, attacked on two grounds. The first questions whether the warrant " . . . particularly describ[es] the place to be searched . . . . " as commanded by the Fourth Amendment. The second attacks the affidavit upon which the warrant is based as defective for lack of an assertion in terms of the informant's reliability. A search by authority of the warrant produced the weapons named in it: three revolvers and a sawed-off shotgun allegedly used in the armed robbery of a drive-in grocery. But the district court suppressed this evidence because it found the warrant did not sufficiently describe the apartment searched, and perhaps on the second ground, also. The United States appeals, and we reverse.

*The Description of the Premises*

"Apartment # 70, located at 3101 Highland Rd., in the City of Baton Rouge" was the description. The apartment intended by it was located in a large, four-building complex which bordered on both July Street and Highland Road and contained approximately 450 apartments. The apartment searched was the only one in the complex numbered 70. But it was in fact located on July Street, not at 3101 Highland Road, which was the address of the business office of the complex. In ascertaining the address for purposes of applying for the warrant, the officers had consulted the telephone directory, which carried the address of the business office as that of the complex. Apartment 70 sits about 300 yards from the business office, in a separate building. A canal divides the two locations so that moving from one to the other requires traveling several city blocks and departing some distance from the premises of the complex.

* Of the U.S. Court of Claims, sitting by designation.

■ The classic statement of the standard to be applied in examining the sufficiency of a warrant's identification of the place to be searched appears in *Steele v. U. S.*: "It is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended." 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed. 757, 760 (1925).[1] The test is one of reasonableness, and "[t]echnical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." *U. S. v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689 (1965).

■ Problems such as we here face are not akin to those of conveyancing.[2] Many courts, in many cases, have recognized that a minor error in a portion of the description of premises to be searched does not necessarily invalidate the search. For example, in *Steele, supra,* the Supreme Court upheld the search of 6<u>09</u> West 46th Street under a warrant authorizing the search of 6<u>11</u> West 46th, the building being a large warehouse having these two numbers and only partly partitioned. In *United States v. Melancon*, 462 F.2d 82 (5th Cir. 1972), we upheld the search of a man's residence at Route 2, Box 62<u>2</u> under a warrant describing his next-door business "at Route 2, Box 62<u>3</u> . . . ." Judge Cabot, in his exhaustive and definitive opinion in *United States v. Sklaroff,* 323 F.Supp. 296 (S.D.Fla.1971), upheld the search of apartment 310 on the *third* floor of a building under a warrant describing it as being on the *second.* Among the cases collected in that opinion (at 319–320) are the following, in each of which the validity of the search was upheld: *United States v. Contee,* 170 F.Supp. 26 (D.C.1959) (warrant described premises as "entire Apt. A"—

apartment searched was the basement apartment at the correct address but was not designated "Apt. A"); *United States v. Joseph,* 174 F.Supp. 539 (E.D. Pa.1959), *aff'd,* 278 F.2d 504 (3rd Cir.), *cert. denied,* 364 U.S. 823, 81 S.Ct. 59, 5 L.Ed.2d 52 (1960) (warrant listed address to be searched as "209 *Court Terrace,"* address searched was "209 *Minersville Street,"* evidence showed Court Terrace was a continuation of Minersville Street); *United States v. Pisano,* 191 F.Supp. 861 (S.D.N.Y.1961)(warrant listed "a grocery store known as Esta's located on the ground floor of a building at 1<u>2</u>9 West Third Street, Mount Vernon, New York"; correct address was 1<u>0</u>9 West Third); *United States v. Goodman,* 312 F.Supp. 556 (N.D.Ind.1970) (address listed as 51<u>7</u> Conkey Street, premises searched was actually 51<u>9</u> Conkey Street); and *Hanger v. United States,* 398 F.2d 91 (8th Cir. 1968), *cert. denied,* 393 U.S. 1119, 89 S.Ct. 995, 22 L.Ed.2d 124 (1969) (warrant for 14<u>19</u> and 14<u>21</u> North Park; one of the apartments searched was 1419a). Speaking of these decisions, Judge Cabot observes, correctly, we think:

The foregoing decisions illustrate the principle that the determining factor as to whether a search warrant describes the premises to be searched with sufficient particularity is not whether the description given is technically accurate in every detail but rather whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched which is not the one intended to be searched under the search warrant.

Applying these criteria to the instant case, I hold that the error in describ-

1. In this federal prosecution the validity of this search warrant, although executed by state officers, must of course be examined under federal standards. *U. S. v. Melancon,* 462 F.2d 82, 91–92 (5th Cir. 1972), *cert. denied,* 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 487.

2. Indeed, our case derives a certain fey air from the fact that the officers who applied for and executed the warrant evidently knew the correct address and location of the apartment and obtained the anomalous address in a well-meaning effort to be letter-perfect.

ing Apartment 310 as being on the second rather than the third floor of Building Number 3 was of such a minor nature as not to invalidate the search warrant. There was only one apartment in that building with the Numerals 310 on the door, and the F.B.I. Agents searched that apartment. There was little possibility under the facts of this case that an apartment not intended to be searched could have been searched through mistake. One Agent had already viewed the door to that apartment, although he did not take part in the search. The key to Apartment 310 given to the Agent by the manager unlocked the door.

*United States v. Sklaroff,* 323 F.Supp., at 321.

Applying the same criteria to our case, we conclude that since, as in *Sklaroff,* there was only one apartment in the complex bearing the number written in the warrant, there was little likelihood that the wrong premises would be searched—as indeed they were not. And we conclude as well that a reasonable effort on the part of the executing officer—such as going to the address given in the warrant and asking the manager for the keys to apartment 70 and how to get to it—would suffice to locate and identify the premises authorized to be searched. The decision of the district court suppressing the evidence on this ground is clearly erroneous.

### The Affidavit's Lack of an Assertion that the Informant is Known to be Reliable

■ The district court also observed, or arguably held as an alternate ground for invalidating the warrant, that the affidavit upon which the warrant was based was probably insufficient also as failing to attest in terms the reliability of the informant. We disagree. It is true that the affidavit did not describe

3. Unlike the affidavits considered in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

the named informant, a fifteen year-old boy, as previously reliable, or as having given information in the past resulting in successful prosecutions, etc. It did, however, provide the name and address of the juvenile informant[3] and thus lay the spectre of the anonymous troublemaker. In addition, it gave detailed information about the guns,[4] what robbery they were used in, and where they were located. Such detail may base an inference that the informant gained his information in a reliable way, *Spinelli v. United States,* 393 U.S. 410, 417, 89 S.Ct. 584, 589, 21 L.Ed.2d 637, 644 (1969), and so satisfy the alternative test under *Aguilar's* second prong: " . . . or his information 'reliable.' " *See United States v. Acosta,* 501 F.2d 1330, 1335 (5th Cir. 1974) (dissent), *opinion vacated* 509 F.2d 539, 5 Cir., (1975) (en banc).

Indeed, we do not think that the district court, in this case of actual observance of the prohibited weapon by a named, nonprofessional informant, was bound to an iron application of the *Aguilar-Spinelli* rule. The Second Circuit has very recently been called on to consider just such an objection to an informant's affidavit in a case strikingly similar to ours. Responding to a contention that the warrant was defective for want of a recital in the affidavit that the informant was known to be reliable, as *Aguilar-Spinelli* was claimed to require, it held:

Apart from the question of the precise standing of Spinelli after *U. S. v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 . . ., there has been a growing recognition that the language in *Aguilar* and *Spinelli* was addressed to the particular problem of professional informers and should not be applied in a wooden fashion to cases where the information comes from an alleged victim of or witness to a crime. Indeed any other view would mean that, despite the 1972 amend-

4. Not all of which proved accurate in the event.

ment to F.R.Crim.P. 41(c) to the effect that "[t]he finding of probable cause may be based upon hearsay evidence in whole or in part," it would generally be impossible to use hearsay statements of victims or witnesses since ordinarily they would not be previously known to the police.

.    .    .    .    .

Viewed in the light of these decisions, the affidavit was sufficient; it made evident that Thompson had been in the bedroom of Burke's apartment and had talked with Burke about the gun, or at least that he had said so. .    .    . To be sure, it would have been better if the affidavit had recited how Thompson had come to see and hear what he did and still better if there had been an affidavit by Thompson himself   .    .    . but it is clear to us that the magistrate had "a 'substantial basis' for crediting the hearsay." *U. S. v. Harris,* 403 U.S. [573] at 581, 91 S.Ct. 2075, 29 L.Ed.2d 723   .    .    . (plurality opinion). *U. S. v. Sultan,* 463 F.2d [1066] at 1069. It is true also that Thompson could have been lying to the affiants, that the affiants could have been lying to the judge, or both. But such risks are inherent in any system allowing, as it must, that search warrants may be issued on something less than a full trial of the existence of probable cause.

*United States v. Burke,* 517 F.2d 377, 380 (2d Cir. 1975).

This circuit's equivalent of *Burke* is *United States v. Bell,* 457 F.2d 1231 (5th Cir. 1972), which, like *Burke,* stands for the general proposition "   .    .    . that *Aguilar* and *Spinelli* requirements are limited to the informant situation only." 457 F.2d, at 1239.[5] To decide this case, we need not restrict *Aguilar-Spinelli* to the professional informant. For the matter in hand—an identified nonprofessional—a line drawn at anonymity suf-

fices, and we find significant Chief Justice Burger's statement that the *Aguilar* informant-reliability rule applies to "an affidavit based solely on the hearsay report of an *unidentified* informant" (emphasis added). *United States v. Harris,* 403 U.S. 573, 576, 91 S.Ct. 2075, 2078 (1971).

Under the dissent's treatment of *Burke* and *Bell,* no victim of or witness to a crime could cause a warrant to issue unless he chanced to be a person of established credibility. Thus, for example, under the rule advanced by the dissent, persons of dubious credibility—or even of unknown reputation, like the adolescent witness in this case—might be victimized at will without fear that their information could precipitate a search. Whatever the law may be, we doubt it is this.

The dissent's painfully-extracted distinctions of *Bell* are too elaborate for application in the real world. A more bright-line rule is needed if police are to apply it day by day and if we are to pass on their good faith in doing so, as *Peltier* indicates we must:

> If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.

*United States v. Peltier,* 422 U.S. 531, 542, 95 S.Ct. 2313, 2320, 45 L.Ed.2d 374, 384 (1975).

The evidence found in this search should not have been suppressed.

Reversed.

GODBOLD, Circuit Judge (dissenting):

In *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964),[1] the Supreme Court ruled that where proba-

---

**5.** *Cf. United States v. Mahler,* 442 F.2d 1172, 1174–75 (9th Cir. 1971); *McCreary v. Sigler,* 406 F.2d 1264, 1268–69 (8th Cir. 1969).

**1.** *See also Spinelli v. U. S.,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *U. S. v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

ble cause for a search or arrest warrant is established through an informant's tip, the affidavit presented to the issuing magistrate must show (1) that the informant is a credible person and (2) that the inferences drawn are based on fact and are reasonable.

In the instant case, a search warrant was issued on the basis of statements emanating from a 15-year-old tipster. The affidavit presented to the magistrate contained no evidence of the declarant's credibility. The majority excuse this patent noncompliance with the first of *Aguilar's* dual requirements through purported reliance on the language of the Second Circuit in *U. S. v. Burke,* 517 F.2d 377 (CA2, 1975), that "there has been a growing recognition that the language in *Aguilar* and *Spinelli* was addressed to the particular problem of professional informers and should not be applied in a wooden fashion . . . where the information comes from an alleged victim of or witness to a crime."

I am unable to join in the majority opinion. The decision of this court in *U. S. v. Bell,* 457 F.2d 1231 (CA5, 1972), requires us to recognize that there can be circumstances in which a person gives information to police which is used in obtaining a warrant but *Aguilar* and *Spinelli* will not be applied. *Burke* does not, however, fall within the circumstances set out in *Bell.* It carves out a new and unfortunate exception that is out of keeping with the underpinnings of *Aguilar* and *Spinelli.* Additionally, even if *Burke* is treated as correct, it is misapplied to the facts of this case.

Taking the second point first—application of *Burke* if accepted as correct—I do not read that decision to say that *Aguilar* and *Spinelli* standards are always limited to professional informers or that they never have application to "victims" and "witnesses." Such an approach would sweep too broadly, too undiscriminatingly, and in disregard to the rationale of *Aguilar* and *Spinelli.* *Burke* does not purport to go that far—the reference to not applying *Aguilar* and *Spi-*

*nelli* "in a wooden fashion" makes this clear. Nor does Judge Gee go that far— rather he says that sometimes *Aguilar* and *Spinelli* apply to victims and witnesses and sometimes they don't, and for this case he draws a line at the "identified nonprofessional." This has the advantage of convenience but little more than that.

"Identified nonprofessional" victims and witnesses come in all shapes, sizes and circumstances, and so do the offenses of which they declare knowledge. We can best see this by looking at *Bell.* In that case the arrest warrants were based on an affidavit reciting information given to police by three named persons who had witnessed events immediately preceding or following an armed robbery and information given the affiant by three named police officers that tended to tie together and corroborate the information given by the three persons at or near the robbery scene. We upheld the warrants despite the affidavit's failure to evidence declarants' credibility. Judge Clark, writing for the court, declined to hold *Aguilar* and *Spinelli* applicable to the "identified bystander" or the "victim-eyewitness" to a crime. 457 F.2d at 1238. Following this he stated:

> Many informants are intimately involved with the persons informed upon and with the illegal conduct at hand, and this circumstance would also affect their credibility. None of these considerations is present in the eyewitness situation such as was present here. Such observers are seldom involved with the miscreants or the crime. (Footnote omitted.)

*Id.* at 1238–39. Thus the decision does not rest upon an overbroad characterization of ambiguous status, such as "witness," but precisely drawn criteria that relate to indicia of reliability. The informants and the persons identified shared no relation apart from the "actor-detached observer" roles arising directly from the armed robbery. The ages of the three witness-informants were not given, but two bore the prefix "Mrs.," so

we may infer that at least these two were not children. In addition, the number of persons willing and able to supply corroborative identification tips tended to establish reliability. The possibility of misuse by police of information received was too remote to arouse serious concern.

The 15-year-old youth in the instant case was neither the "pure" nor fortuitous bystander, observing events with which he had no connection, nor the "victim-eyewitness" to which *Bell* referred. Rather he falls within the very class of persons from which Judge Clark carefully excluded the declarants there involved. He was a person "involved with the miscreant[s] or the crime." 457 F.2d at 1239. He was sufficiently involved and trusted by the defendant to the extent that the defendant allegedly invited him to participate in a violent felony, told him that he had successfully pulled off the job, and showed him a portion of the loot. His connection with the events was such that there was risk of his tip's having been given to exculpate himself or to curry police favor useful in the event he became a suspect (principal or accessory). The information he gave police was not corroborated by statements of others. Yet his statements were the crucial link in establishing probable cause for the warrant. None of the indicia of reliability present in *Bell* exists here. All signs point in the other direction.[2] Under *Burke's* standards, *Aguilar* and *Spinelli* should apply. Judge Gee's mechanical application of a case which by its own terms was not intended to be so applied merely circumvents what *Bell* teaches us is the real issue—reliability. The indicia of reliability approach was used by this court in *U. S. v. Barfield,* 507 F.2d 53 (CA5, 1975), which held sufficient an affidavit disclosing information from a person not stated to be a reliable informer because the person was a co-defendant and co-participant in the robbery and his statement was against his penal interest, which supplied indicia of reliability.[3]

At least Judge Gee's opinion has the merit of candor. On other facts he might urge that the statement of one claiming to be a nonprofessional victim of or witness to an alleged offense[4] may be the basis for a warrant without any further showing of reliability, unless it affirmatively appears from other revealed information that the person who gave the statement is not reliable—in short, status alone [or, more accurately, a claim of status] carries its own credentials of reliability, which is prima facie established unless and until other revealed information casts doubt on reliability. Thus, in *Barfield, supra,* the status of the source person as co-defendant and co-participant made his self-inculpatory statement sufficiently believable.[5] Reliability may also be drawn from the source person's official status.[6] However, the facts here do not permit application of a theory of prima facie reliability not sufficiently put in question. The source person's youth, his involvement with the alleged miscreant, his possible motive of self-exculpation, and the lack of corroboration, cast doubt on his reliability. Thus, Judge Gee must, and does, take the position that the [assertion of] status as nonprofessional victim or witness is sufficient even if other and revealed information tends to show that the source person is nonreliable. Thus, the [assertion of] status is not merely

---

**2.** The single factor that tends to make this tipster believable is the fact that the gun was found where he said it was. If one thing is clear, it is that this discovered evidence cannot validate the warrant.

**3.** Compare the present case where the tipster's statement is self-exculpatory.

**4.** Of course, one *claiming to be* a nonprofessional victim or witness to an offense may prove to be neither victim, witness nor non-

professional when the facts are in. Indeed, there may have been no offense at all.

**5.** *Accord, U. S. v. Viggiano,* 433 F.2d 716 (CA2), *cert. denied,* 401 U.S. 938, 91 S.Ct. 934, 28 L.Ed.2d 219 (1971); *U. S. v. Brown,* 455 F.2d 1201 (CA9, 1972).

**6.** *Stone v. U. S.,* 390 U.S. 204, 88 S.Ct. 899, 19 L.Ed.2d 1035 (1968) (unnamed Special Agent of Internal Revenue Service).

prima facie but conclusive. Or to put it another way, reliability is an irrelevant consideration when [one claiming to be] a nonprofessional victim or witness is the source of information. I hope that we would hold insufficient a warrant based on information from an identified non-professional who asserts he is a victim or witness and is revealed to be either six years old, dead drunk, standing 600 yards from the alleged miscreant that he identifies, or a pathological fantasizer. A magistrate could not validly issue a warrant based on first-hand information of a police officer if the revealed facts throw serious doubt on its reliability. The rule cannot be less demanding for a warrant based upon hearsay.

I turn to the first question—whether *Burke* is correct in its premise that *Aguilar* and *Spinelli* were "addressed to the particular problem of professional informers." It seems to me that the *Aguilar* court was concerned with a larger problem which includes—but is hardly limited to—the use of professional informants. It was attempting to regulate the complex realities of investigation and prosecution of "victimless" crimes and possessory offenses. Where the forbidden act is consensual, the victim, if any, seldom seeks prosecution. Where the crime is perpetrated in solitude or secrecy, there will be no witness to come forward and accuse. In such a context, informants necessarily are the primary vehicle through which police work is accomplished. See Note, The Supreme Court, 1970 Term, 85 Harv.L.Rev. 3, 59–60 (1971).

Where informants are necessary, their utilization carries a risk of prevarication, for the informant may be under such pressure or feel such desire to supply incriminating information that he will invent or embellish facts before he allows himself to fail at his task. It was to eliminate even the possibility of such abuse of power—which could "make a mockery of the warrant process"—that *Aguilar* and *Spinelli* were written. Note, The Supreme Court, 1968 Term, 83 Harv.L.Rev. 7, 181 (1969); see also 85

Harv.L.Rev. at 61. The potential for abuse of power by informants is not restricted to paid tipsters. Inducement to invent or to embellish facts may be quantitatively different as between paid and unpaid informants, but it is not necessarily qualitatively distinct, nor is untruthfulness of demonstrated greater or lesser incidence in those two classes.

*Bell* was not a "victimless" crime but an armed robbery witnessed by a number of persons willing and able to identify the assailants. Such is not a situation in which the use of informants is necessary or usual to police work, unlike the passive or undercover police work the Supreme Court considered in *Aguilar.*

In *Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), an informer's tip provided the impetus for defendant's arrest and the search incident thereto. The complaint on which the arrest warrant was issued did not refer to the informer but rested on conclusory statements by the sheriff. The Supreme Court held the complaint inadequate and also rejected a contention that the informer's description of defendant and the car in which he was arrested supported a warrantless, probable cause arrest. The status of the informer was neither revealed nor inquired into by the Court, which re-emphasized *Aguilar* and *Spinelli,* and there is nothing to suggest he could not have been a mere bystander who had witnessed the crime. Yet the Court's implication is that whatever the informer's status, the *Aguilar-Spinelli* standards apply when either an arrest warrant or a probable cause arrest has its factual basis in an informer's tip.

Similarly, in *U. S. v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1973), neither the affidavit nor the opinion indicated that the informer was previously known to or used by the police as an informer. The Sixth Circuit relied on *Aguilar* and *Spinelli* to hold the affidavit insufficient. Had the Supreme Court viewed those decisions as establishing standards applicable only to professional informers, the *Harris* facts warranted at least an initial inquiry into the inform-

er's status. Instead the opinion acknowledged applicability of *Aguilar* and *Spinelli* but rationalized noncompliance with their commands. Chief Justice Burger's language explaining the grant of certiorari in *Harris* further evidences an intent that nonprofessionals not be excluded in a plenary matter from the *Aguilar-Spinelli* requirements. He defined the issue as involving the "informant known to the police, but not identified to the magistrate, who purports to relate his personal knowledge of criminal activity." *Id.* at 575, 91 S.Ct. at 2078, 29 L.Ed.2d at 729. That description includes nonprofessionals, bystanders, and victims as well as paid informers. Even the dissenting opinion's framing of the issue seems to acknowledge inclusion of nonprofessionals within the rule, referring to "unidentified informants who purport to describe criminal activity of which they have personal knowledge, and where it does not appear that such informants have previously supplied accurate information to law enforcement officers." *Id.* at 586, 91 S.Ct. at 2083, 29 L.Ed.2d at 735.

Arguably these cases tend to reject the carving out of eyewitnesses and victims from *Aguilar* and *Spinelli*. At least they show that the distinction now made between professional informers and other persons who give information to the police has not been apparent to the Supreme Court. Nor was such a distinction apparent to this court in *Texas v. Gonzales,* 388 F.2d 145, 148 (CA5, 1968), a post-*Aguilar* case, where the search warrant was based on a tip that narcotics were being peddled at a particular address and that the informer had seen a person who lived at that address pick up a small package from the alley. Without indicating the informer's status as a professional or bystander witness, we held the warrant invalid, saying, "there was nothing to suggest that the informer was reliable or that his tale was credible."

I would affirm the holding of the District Judge who held the affidavit insufficient because it lacked information as to the reliability of the 15-year-old tipster.

I would also affirm the District Judge on the issue of misdescription. This is a factual inquiry, made on a case-by-case basis. The District Judge below had a complete record before him. He considered this matter twice. Following the first hearing he granted the motion to suppress and the government appealed. On request of the government we remanded to permit, in the District Court's discretion, the receipt of additional evidence from the government. The District Judge admitted the additional evidence and again granted the motion to suppress. He heard the testimony of one of the executing officers and the brother of the defendant (who lived in apartment 70 with the defendant) and received the affidavit of the manager of the apartment complex. He had before him both a diagram and a large aerial photograph of the area. He is a resident of Baton Rouge. In these circumstances the District Judge was in a much better position to reach a correct decision than appellate judges far removed from the scene. His decision regarding misdescription was not plainly erroneous.

I respectfully dissent.