UNITED STATES of America,
Plaintiff-Appellee,

v.

Dennis Harry FLYNN and James
Anthony McDonnell,
Defendants-Appellants.

No. 79–5406.

United States Court of Appeals,
Fifth Circuit.*

Jan. 7, 1982.

Rehearings Denied Feb. 8, 1982.

* Former Fifth Circuit case, Section 9(1) of Public Law 96-452—October 14, 1980.

**1298**

Alvin E. Entin, Steven Kollin, North Miami Beach, Fla., for defendants-appellants.

Nicholas P. Geeker, U. S. Atty., Pensacola, Fla., for plaintiff-appellee.

Before KRAVITCH, HENDERSON and REAVLEY, Circuit Judges.

KRAVITCH, Circuit Judge:

This case raises issues concerning the validity of the government's search of an aircraft after tracking its entry into this country through the use of electronic surveillance. Specifically, appellants argue the government violated their fourth amendment rights by attaching the tracking device, known as a "beeper," to the inside of their aircraft[1] and by conducting a warrantless search of the plane after tracking its entry into the United States. Appellants also contend the evidence admitted at trial[2] was insufficient to sustain their convictions for possession with intent to distribute approximately thirteen tons of marijuana. We hold: (1) that there was probable cause justifying attachment of the beeper to appellants' plane; (2) that the search of appellants' aircraft after its landing in the United States was a border search for which no warrant was required; and (3) that the evidence was sufficient to sustain appellants' convictions.

## I. Facts

On January 15, 1979, U.S. Customs agents arrested James McDonnell, Anthony Ricci, and Victor Simeone at the Fort Lauderdale Airport in Florida in connection with suspected smuggling of narcotics. The agents had observed the three men at three a. m. in a remote area of the airport near a DC–3 aircraft that had landed about fifteen minutes earlier loaded with 5200 pounds of marijuana and hashish. McDonnell and Ricci disclaimed any involvement with the DC–3, but their fingerprints were later found within the aircraft. Simeone, who said he had come to the airport to pick up the other two men, was released because no other evidence linking him with the plane was discovered. McDonnell and Ricci each posted $50,000 in cash to gain release on the day of their arrest. Customs agents informed Kevin T. Foley, Special Agent with the Drug Enforcement Administration (DEA), of the events culminating in the arrest of McDonnell and Ricci.

Two weeks later, Agent Foley was contacted by Mr. B. L. Abram, Chief of the Transportation Section of the Federal Aviation Administration (FAA). Abram advised Foley that the FAA had grounded a Lockheed Constellation aircraft for safety violations. Thereafter James McHendree, the former owner of that plane, notified Abram

---

1. The aircraft's registration, made out in the name of a corporation, was signed by appellant McDonnell. Although the extent of appellant Flynn's interest in the plane, if any, is unclear, the government has not pursued on appeal its challenge to his standing to contest the search, and therefore we do not address that issue.

*See Steagald v. United States,* 451 U.S. 204, 207–10, 101 S.Ct. 1642, 1645–46, 68 L.Ed.2d 38, 43–44 (1981).

2. Appellants waived their right to jury trial, and the case was tried by the district court judge.

that he had sold the plane and that the new owner, Victor Simeone, was concerned about compliance with FAA regulations. That evening Simeone telephoned Abram at his residence and told him the plane could not be grounded because Simeone had a commitment to use it the following day. Simeone said he would have a crew work on the plane that night to bring it into conformance with FAA standards by the following day. Abram told Simeone that he had three weeks in which to comply with the regulations, and Simeone replied that he, his pilot James McDonnell, and McHendree, would meet Abram at his office the following morning to discuss the problem. At eight a. m. the following day Simeone and McHendree arrived at Abram's office and advised him that the plane was mechanically sound and could be brought into compliance with FAA regulations by the end of the day. Abram advised Simeone that because of the change in ownership of the plane Simeone was required to submit to the FAA an inspection program, which could take up to three weeks to be approved. Simeone insisted that the plane could not be held up and requested a temporary permit, which Abram denied.[3] When questioned about the new registration, Simeone told Abram the aircraft was registered in the name of a corporation of which McDonnell was president and Simeone an "investor." Simeone and McHendree then left Abram's office, but McHendree returned a little while later and requested to speak to Abram privately. McHendree told Abram he was afraid Simeone would renege his purchase of the plane if it could not take off that day. McHendree said

Simeone had suggested that McHendree reregister the plane in his name to avoid the necessity of obtaining a new FAA inspection program.

Abram promptly informed DEA Agent Foley of the grounding of the Constellation aircraft and of his ensuing conversations and meeting with Simeone and McHendree. On the morning of February 1, 1979, Agent Foley set up surveillance of the Constellation at the Miami International Airport. At that time he observed McDonnell, Simeone, and Ricci performing maintenance work on the aircraft. Later that day FAA personnel conducted a routine FAA inspection of the plane and found that it was completely devoid of seats.[4]

On the basis of the above information,[5] which Agent Foley submitted in an affidavit to a federal magistrate, he obtained an order from the magistrate authorizing placement of an electronic surveillance device in the aircraft. Pursuant to that order, government agents entered the plane on February 4, 1979, and installed a beeper in the cockpit area. The agents observed the plane's departure from the Miami airport on the morning of February thirteenth. Just after midnight on the fourteenth, the aircraft's signals were picked up as it approached the continental United States. A Customs aircraft followed appellants' plane from a point near West Palm Beach to the airport in Panama City, Florida, where it landed at three o'clock that morning. After making a landing at the same airport, the Customs agents who had followed the Constellation were met by Customs officials

---

3. Simeone requested a permit to fly to Sebring, Florida to have the plane's engines repaired. Abram denied the permit because Simeone had stated previously that the plane's engines were in excellent condition.

4. See note 12 infra.

5. The affidavit also contained Abram's observations, as related to Agent Foley, that the Constellation aircraft had the capacity to carry 12 tons of marijuana and that its fuel tank capacity was sufficiently large to permit a nonstop flight from the United States to South America. This information is highly suggestive and its probative value slight. We mention it

only to make clear that our determination of probable cause does not depend on it to any significant degree. Moreover, we attribute no weight to the additional statement in the affidavit concerning the unverified suspicions of the Broward County Sheriff's Office and the DEA that Simeone was involved in drug smuggling, since we conclude that that information fails to meet the reliability standards of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). See discussion infra at 1305–1306.

from the Panama City branch office. Meanwhile, the Constellation, after landing and while taxiing, had become stuck when its front wheel went off the runway. An airport security officer observed McDonnell, Dennis Flynn, and Henry Mora deplane and noticed that the plane was loaded with some kind of bundles. Appellants asked the officer whether they could get assistance in dislodging the plane's wheel but were told help would be unavailable until later in the day. They then left the terminal area on foot and were arrested by Customs officers while standing on a road near the runway. A warrantless search of the plane thereafter disclosed a cargo of approximately thirteen tons of baled marijuana. Fingerprints taken from the aircraft matched those of McDonnell and Flynn.

Appellants [6] were charged and convicted of possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1).[7] They appealed to this court challenging the district court's denial of their motions to suppress and contesting the sufficiency of the evidence on which their convictions were based. While the appeal was pending the Fifth Circuit decided, and

then voted to rehear en banc, the case of *United States v. Michael*, 622 F.2d 744 (5th Cir. 1980), which addressed the issue of whether placement of a beeper on the outside of a vehicle requires a warrant or probable cause under the fourth amendment. The en banc court held that neither a warrant nor probable cause were necessary and that reasonable suspicion of criminal activity was sufficient to justify installation of the beeper. *United States v. Michael*, 645 F.2d 252 (5th Cir. 1981) (en banc). In light of *Michael*, we remanded this case to the district court for a determination of the placement of the beeper. Had the beeper been attached to the outside of the aircraft, *Michael* would have controlled,[8] and it would have been unnecessary to decide the admittedly close question whether the warrant here was based on probable cause. On remand the parties stipulated that the beeper was installed on the inside of the plane in the cockpit area. The *Michael* court did not consider the legality of a warrantless beeper installation *inside* a conveyance.[9] Before addressing this issue, we first examine the facts of the case before us to determine the validity of the warrant. Having reviewed

**6.** Mora was charged in the same indictment as appellants McDonnell and Flynn. His trial was severed from appellants' trial when the district court granted him a continuance.

**7.** The original indictment contained a conspiracy count in addition to the possession charge. The conspiracy count was dropped by the government as part of a plea bargain.

**8.** Appellants do not argue that this case is distinguishable from *Michael* because the conveyance involved here is a plane rather than an automobile. Attachment of a beeper to the outside of a plane located on a public runway would be no more intrusive than the installation of a beeper on a van parked on a public road, which was upheld in *Michael*, 645 F.2d at 257–58. The act of tracking an airplane, however, particularly in the international airways where its movements are unlikely to be observed by either the public or regulatory authorities, arguably intrudes to a greater extent on legitimate expectations of privacy than monitoring of automobiles. *See Note, Tracking Katz: Beepers, Privacy, and the Fourth Amendment*, 86 Yale L.J. 1461, 1496 n.150 (1977). In any event, we do not address whether airplanes per se should be accorded the same treatment as automobiles for fourth

amendment purposes since the beeper search here met the most stringent of fourth amendment standards—namely, probable cause.

**9.** In approving the beeper installation in *Michael*, the majority's analysis focused partly on the "[i]ntrusiveness" of the act of attachment. *United States v. Michael*, 645 F.2d at 258. In finding that "the intrusion occasioned by the placement of the beeper [on the exterior of Michael's van] was not great," the court noted that "nothing from the interior of the van was seized or searched." Moreover, the court relied on *Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurality opinion), which held that scraping of paint from the exterior of an automobile was not a search within the meaning of the fourth amendment. The majority opinion thus suggests, at least inferentially, that its holding is limited to cases in which attachment of the beeper involves no physical intrusion into the conveyance. *United States v. Michael*, 645 F.2d at 262 (opinion of Tate, J., dissenting). *See also United States v. Cady*, 651 F.2d 290 (5th Cir. 1981) (assuming without deciding that beeper installation requiring physical entry of aircraft is full-scale search).

the supporting affidavit, we conclude that the warrant was based on probable cause. Because the intrusion into appellants' plane was justified by a valid warrant, we need not decide whether it would have transgressed the bounds of the fourth amendment had it been conducted without a warrant on the basis of a mere reasonable suspicion.

Appellants' motion to suppress the contraband and other evidence discovered during Customs' search of the Constellation at the Panama City Airport is based on two arguments. First, appellants claim the warrant authorizing attachment of the beeper to their plane was not supported by probable cause. Since Customs' observation of appellants' landing and the ensuing search of the plane at the Panama City Airport could not have occurred but for the installation of the electronic device, appellants argue, the contraband discovered during that search is the fruit of a poisonous beeper and therefore should have been suppressed. Appellants' second contention is that, even if attachment of the beeper and surveillance of their whereabouts was authorized by a valid warrant, Customs should have obtained another warrant before searching the aircraft at Panama City. Moreover, appellants claim that there was no probable cause when the plane arrived at Panama City that it contained contraband and the search was therefore illegal. The following two sections address these arguments in turn.

## II. The Beeper Search

Appellants advance three arguments for their position that the affidavit used by Agent Foley to obtain the beeper warrant was invalid. They claim first that the statements made by Abram to Agent Foley and recounted by Foley in the affidavit failed to meet the reliability standards established in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) because the

affidavit contained no information indicating that Abram was a reliable informant. In *Aguilar*, a magistrate had issued a warrant authorizing a search of defendant's home for narcotics based on an affidavit that contained only the statement of two police officers that they had "received reliable information from a credible person and do believe that ... narcotics and narcotic paraphernalia are being kept at [defendant's] premises for the purpose of sale and use contrary to the provisions of the law." *Aguilar v. Texas, supra* at 109, 84 S.Ct. at 1511 (quoting from affidavit). The Court held the warrant invalid because the mere statement in the affidavit of the unidentified informant's suspicion concerning defendant's activities was inadequate to enable the magistrate to make an independent judgment whether the facts relied on constituted probable cause. In *Spinelli* the affidavit stated, *inter alia*, that a "confidential reliable informant" had tipped the FBI that defendant was using a certain apartment to conduct a bookmaking operation. *Spinelli v. United States, supra* at 413–14, 89 S.Ct. at 587–88. The Court held the tip failed to meet the requirements of *Aguilar* because the affidavit contained no reasons in support of the affiant's assertion that the informer was reliable nor a statement of "the underlying circumstances from which the informant concluded Spinelli was running a bookmaking operation." *Id.* at 414–16, 89 S.Ct. at 588–89.[10] This Circuit has characterized the rule established in *Aguilar* as "two-pronged":

> First, the magistrate must be presented with the facts from which the informant concluded that some criminal activity was taking, or had taken, place. He must then assess these underlying facts to determine whether or not the inference of criminal activity is warranted. Second, the magistrate must be presented with facts which establish the probable credibility of the informant or the reliability of his information.

---

10. In *Spinelli* the Court also stated that informant reliability, if not established through the *Aguilar* approach of stating facts directly indicating the trustworthiness of the informant, alternatively could be demonstrated by independent evidence corroborating the information relayed by the informant. *Spinelli v. United States*, 393 U.S. at 415, 89 S.Ct. at 588.

*United States v. Martin,* 615 F.2d 318, 323–24 (5th Cir. 1980).

■■■ Applying this test to the information obtained by DEA Agent Foley from FAA official Abram, we find no deficiency in the affidavit. Abram's detailed descriptions of the circumstances and substance of his conversations with McHendree and Simeone on the evening of January 31, 1978 and the following morning are a far cry from the conclusory allegations of criminal activity condemned in *Aguilar* and *Spinelli.* Although some suspicion on the part of Abram is indicated by his decision to contact the DEA and by his description of the plane's physical characteristics,[11] certainly that does not undermine the reliability of a tip consisting of detailed facts personally known[12] to him. In short, we find Abram's statements fully complied with the first prong of *Aguilar* by setting forth in detail the facts that led him to suspect criminal activity.

The second prong of *Aguilar* requires facts showing the informant's credibility. Although both *Aguilar* and *Spinelli* involved unidentified or "confidential" informants, we have generally applied their requirements even where the informant's identity is revealed in the affidavit, since "[t]he naming of the informants places no facts relevant to their trustworthiness before the magistrate." *United States v. Martin, supra* at 325 n.9. *But cf. United States v. Campbell,* 575 F.2d 505 (5th Cir. 1978) (identified, unpaid informant who gave detailed information was exempt from informant-credibility prong of *Aguilar*); *United States v. Darensbourg,* 520 F.2d 985 (5th Cir. 1975) (same). We have made a clear exception to this rule where the informant is identified as a "bystander or victim-eyewitness to a crime." *United States v. Bell,* 457 F.2d 1231, 1238–39 (5th Cir.), *appeal after remand,* 470 F.2d 1178 (5th Cir. 1972). *See also United States v. Ashley,* 569 F.2d 975 (5th Cir.), *cert denied,* 439 U.S. 853, 99 S.Ct. 163, 58 L.Ed.2d 159 (1978) (that informant's statement is against penal interest supports finding of credibility); *United States v. Darensbourg, supra* (identified nonprofessional informant's statement, which was detailed enough to be corroborated, exempt from second prong of *Aguilar*). The rationale for the victim or bystander exception is that the statements of such eyewitnesses will presumably be based on their own observations and thus are not likely to reflect mere "idle rumor or irresponsible conjecture." *United States v. Bell, supra* at 1238. Whereas other informants, who often are "intimately involved with the persons informed upon and with

---

11. See note 5 *supra.*

12. Although an informant's information need not always be based entirely on personal knowledge, *Aguilar* makes clear that the source of the informant's tip should be revealed in the affidavit. *See Aguilar v. Texas,* 378 U.S. at 113–14, 84 S.Ct. at 1513. *See also United States v. Character,* 568 F.2d 442, 444 (5th Cir. 1978) ("affidavit must set forth some underlying circumstances which reveal the source of the informer's information pertaining to the criminal activity"). The affidavit clearly indicates that all of the information relayed by Abram to Agent Foley, with the exception of Abram's description of the physical characteristics of appellants' aircraft, was based on Abram's own observation of and conversations with McHendree and Simeone. As appellants point out, the affidavit does not specifically state the source of Abram's knowledge that the aircraft had no seats. The affidavit does state, however, that Abram said an inspector had boarded appellants' plane and performed a "routine FAA inspection" on the afternoon of February 1, 1979. It is hard to imagine that the absence of seats in the interior of the plane would have escaped the notice of the FAA inspector. Abram's statements regarding the cargo and fuel capacities of the Constellation, see note 5 *supra,* could likewise be attributed to the inspection, or, more likely, Abram may have been relating general information about the model of aircraft that was within his expertise as an FAA official, rather than describing observations about the particular plane owned by appellants. While not a model of clarity on this particular point, the affidavit overall is exemplary as far as compliance with *Aguilar-Spinelli* requirements, and reading it as a whole, *cf. United States v. Ventresca,* 380 U.S. 102, 111, 85 S.Ct. 741, 747, 13 L.Ed.2d 684 (1965) (affidavit read "as a whole" in determining that hearsay information was attributable primarily to law enforcement officials), we conclude it satisfies *Aguilar*'s requirement that it indicate where the informant obtained the information he has proffered to the government.

the illegal conduct at hand," may have personal reasons for giving shaded or otherwise inaccurate information to law enforcement officials, such is not true of bystanders or eyewitness-victims who have no connection with the accused. *See id.*

■ No case in this Circuit has stated a general exception to the informant-credibility prong of *Aguilar* for statements made by government officials. Dictum in one Fifth Circuit case suggests that *Bell* exempts from the informant-credibility requirement *all* identified nonprofessional informants.[13] *United States v. Darensbourg, supra* at 989. *But cf. id.* at 989–93 (Godbold, J., dissenting). We need not attempt to define the outer contours of the *Bell* holding to establish an exception to *Aguilar*'s second prong for this case, however. We go only so far as to establish an exception for government officials who, while engaged in investigatory or regulatory responsibilities, discover evidence of possible criminal activity. We believe such an exception to be consistent with the reasoning of *Bell*, since information gathered by government officials in the course of their duties and later relayed to law enforcement officers is no more likely to be based on rumor and speculation or tainted by personal involvement with the perpetrators than are the statements of eyewitnesses.

Moreover, other precedents support a presumption in favor of government officials'

credibility. In *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), the Supreme Court upheld under the fourth amendment a warrant based on an affidavit that was prepared by one federal law enforcement official but reflected partly the observations of other federal officers working on the case. Despite the affidavit's failure to indicate which of the facts alleged were hearsay and which were within the affiant's personal knowledge, the Court held the affidavit sufficient on the grounds that the observations it recounted were made by IRS investigators[14] and the "[o]bservations of fellow officers in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." *Id.* at 111, 85 S.Ct. at 747. In *United States v. Hayles*, 471 F.2d 788 (5th Cir.), *cert. denied*, 411 U.S. 969, 93 S.Ct. 2159, 36 L.Ed.2d 690 (1973), a panel of this Circuit summarily rejected a challenge to a search warrant where the underlying affidavit, though "not based on the personal knowledge of the affiant, [ ] was based on the personal observations of a fellow law enforcement official engaged in the same investigation." *Id.* at 793. Such information, the court held, "could be presumed reliable." In *Brooks v. United States*, 416 F.2d 1044 (5th Cir. 1969), *cert. denied*, 400 U.S. 840, 91 S.Ct. 81, 27 L.Ed.2d 75 (1970), we made clear that observations of local law enforcement officers relayed to federal authorities participating in a common inves-

13. *United States v. Campbell*, 575 F.2d 505, 507 n.1 (5th Cir. 1978), describes *Darensbourg* as "holding that [a nonprofessional] informant need not meet the strict requirements of an informant's reliability under *Aguilar-Spinelli*." However, considering the specific facts in *Darensbourg*, as well as those in *Campbell*, we view those cases as recognizing an exception to the reliability requirement for nonprofessional informants *who have given detailed information that law enforcement officials have corroborated.* This interpretation is supported by the *Darensbourg* court's reliance on *Spinelli*, which created the corroboration exception to prong two of *Aguilar.* See note 10 *supra.* Thus, we regard any suggestions in *Darensbourg* or *Campbell* of a broader exception to *Aguilar* as dicta.

14. The Court rejected the First Circuit's assumption "that all of the information in [the]

affidavit may in fact have come from unreliable anonymous informers, passed on to Government Investigators, who in turn related this information to [the affiant]," on the ground that the affidavit stated it was based on the affiant's own observations and "information received officially from other Investigators ... assigned to this investigation, and reports orally made to me describing the results of their *observations* and investigation." *United States v. Ventresca*, 380 U.S. at 111, 85 S.Ct. at 747. "Moreover," the Court noted, "upon reading the affidavit as a whole, it becomes clear that the detailed observations recounted in the affidavit cannot fairly be regarded as having been made in any significant part by persons other than full-time Investigators of the Alcohol and Tobacco Tax Division of the Internal Revenue Service." *Id.*

tigation are presumptively reliable under the second prong of *Aguilar. See also United States v. Black*, 344 F.Supp. 537, 539 (N.D.Ga.1972), *affirmed*, 476 F.2d 267 (5th Cir. 1973) (per curiam) (magistrate entitled to rely on observations of members of narcotics squad of distant police force). We see no reason for distinguishing these cases from the facts presently before us. The affidavit states that Abram is the Chief of the Transportation Division of the FAA. While not a law enforcement officer, he is nonetheless an agent of the Federal Government charged with significant responsibility. The information related by Abram to Agent Foley consisted of (1) conversations between McHendree, Simeone, and himself concerning compliance with FAA regulations that he had a duty to ensure would be carried out; and (2) observations made by an identified FAA inspector during an inspection of appellants' plane for compliance with FAA regulations. Certainly his statements relating this information discovered by him while carrying out his duties as a federal official are no less reliable than those of any law enforcement agent, whether federal or local. Finally, we note that *United States v. McDonald*, 606 F.2d 552 (5th Cir. 1979), which held that FBI "Wanted" flyers and National Crime Information Center printouts are sources of information reliable enough to form the basis for a determination of probable cause, supports our view that observations of government officials made in the course of duty are generally entitled to a presumption of credibility that is alone sufficient to meet prong two of *Aguilar*.

Appellants next argue that the affidavit contains no observations that directly indicate use of the Constellation aircraft for criminal activity. Appellants suggest a rule that would require law enforcement agents, before establishing electronic surveillance of an aircraft, to have already observed its use for illegal activity. We do not agree that the probable cause standard is as stringent as appellants contend.

Probable cause exists where the affiant's evidence would support a reasona-

ble belief "that an offense has been *or is being* committed." *United States v. Melancon*, 462 F.2d 82, 89 (5th Cir. 1972) (emphasis added) (citation omitted). Hence, a showing of past illegal conduct is not a prerequisite to finding probable cause. Moreover, the standard of probable cause is "[o]nly a probability, and not a prima facie showing," and "affidavits of probable cause are tested by much less rigorous standards than evidence at trial." *Id.* (quoting *Beck v. Ohio*, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964) and *McCray v. Illinois*, 386 U.S. 300, 311, 87 S.Ct. 1056, 1062, 18 L.Ed.2d 62 (1967)). Great deference is accorded to magistrates' determinations on the question of probable cause, *United States v. Copeland*, 538 F.2d 639, 641 (5th Cir. 1976), and a magistrate's finding should be sustained in doubtful or marginal cases. *United States v. Maestas*, 546 F.2d 1177, 1180 (5th Cir. 1977). Finally, in judging the sufficiency of an affidavit to determine whether probable cause exists, we assess not the individual facts but "the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers." *United States v. Clark*, 559 F.2d 420, 424 (5th Cir.), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977) (quoting *Smith v. United States*, 358 F.2d 833, 837 (D.C.Cir.1966) (opinion of Burger, J.)). "Viewing the evidence in this manner it may truly be said that the total may be a sum greater than its parts." *United States v. Clark, supra* at 424.

Applying the above principles to the facts before us, we uphold the magistrate's finding that there was probable cause. The affidavit stated that three men had been arrested in the early hours of one morning near an airplane loaded with several thousand pounds of marijuana and hashish. Although one of them—Simeone—was released without charges, he had clearly associated himself with the others. The other two—McDonnell and Ricci—were taken into custody but posted large sums of cash to be released on bail. Two weeks after this incident, the same three men were in-

volved with the purchase of another plane.[15] There were also the circumstances of Simeone's conversations with Abram and the ensuing FAA inspection. McHendree told Abram that Simeone had purchased the Constellation, paying $150,000 in cash, and was adamant that it be allowed to fly on February first, despite the difficulties in complying with FAA requirements. Although Abram informed him that it might take several weeks before the plane could be flown, Simeone continued his attempt to obtain immediate clearance in his second conversation with Abram. Failing that, he sent McHendree back later that day with instructions to reregister the plane as its former owner for the purpose of circumventing the FAA's new-registration requirements. Although Simeone stated he was an investor in and acted as representative for the corporation he claimed had purchased the aircraft, he was unable to remember the exact name and location of the enterprise.[16] Finally, an FAA inspection of appellants' aircraft revealed that it was completely devoid of seats, thus making clear its intended use for transporting cargo. These latter facts—the apparently very recently formed corporation, the large amount of cash tendered by Simeone for the aircraft, his repeated insistence that the FAA act with utmost haste to clear the aircraft for flying, and finally the absence of seats—while alone insufficient to establish probable cause, clearly add to the suspicion that narcotics trafficking was under way. Viewing them together with the initial arrest of Simeone, McDonnell, and Ricci, with a plane full of marijuana containing the fingerprints of two of them, the large amounts of cash tendered by McDonnell and Ricci to post bail, and the involvement of the very same trio in the second operation, we find the totality of the facts consti-

tuted probable cause that appellants' Constellation aircraft was about to be used for illegal drug trafficking. *Cf. Travis v. United States*, 362 F.2d 477 (9th Cir.), *cert. denied*, 385 U.S. 885, 87 S.Ct. 179, 17 L.Ed.2d 113 (1966) (past pattern of conduct of defendant in making flights to United States allegedly to acquire heroin supported finding of probable cause that he was transporting narcotics); *United States v. Nilsen*, 482 F.Supp. 1335 (D.N.J.1980) (past pattern of defendant's conduct in establishing relationships with mail-order film developing companies supported probable cause he was currently engaged in mailing of obscene matter).

■ Finally, appellants challenge the final paragraph in the affidavit, which stated that an officer in the Broward County Sheriff's Office said Simeone had been suspected of smuggling narcotics into South Florida and that DEA files included information indicating Simeone's involvement with narcotics smuggling in Central Florida. We agree with appellants that these statements are mere conclusory allegations of the type condemned in *Aguilar* and *Spinelli*. The affidavit does not set forth underlying facts indicating the basis of the Sheriff's Office and DEA personnels' suspicions; nor does it show whether those facts were personally observed by law enforcement officials or relayed by a reliable informant. The allegation thus fails both prongs of *Aguilar*. This is not sufficient grounds for reversing the district court's denial of appellants' suppression motions, however, since we find the affidavit showed probable cause even excluding this portion. *See United States v. Tarrant*, 460 F.2d 701, 703–04 (5th Cir. 1972) (where information in affidavit is per se sufficient to establish probable cause, court need not consider at-

---

**15.** Simeone contacted FAA official Abram as representative of a corporation he said had purchased the second aircraft. He named McDonnell as the president of and pilot for the corporation. All three of the men—McDonnell, Simeone, and Ricci—were observed by Agent Foley doing maintenance work on the plane after Simeone's conversations with Abram.

**16.** Simeone told Abram the name of the corporation was "Caribean [sic] Airways," but the registration certificate found on the plane by the FAA inspector was in the name of "Carib Aviation." Simeone initially told Abram the corporation was located at Suite 902 of a bank building in Fort Lauderdale, Florida but later corrected himself and said the office was in Suite 919.

tacks on other information in affidavit). *Cf. United States v. Farese*, 612 F.2d 1376 (5th Cir.), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3019, 65 L.Ed.2d 1118 (1980) (affidavit containing negligent misstatements not invalid where, when purged of false information, affidavit still contained evidence sufficient to show probable cause).

### III. The Panama City Airport Search

Appellants contend that, even if attachment of the beeper and tracking of appellants' plane was justified by probable cause, Customs agents' entry into the plane at the Panama City Airport violated the fourth amendment. After landing at Panama City, appellants were arrested by U.S. Customs agents. Immediately thereafter, other agents in the group approached the aircraft, smelled marijuana, and then searched the plane and discovered the contraband. Appellants argue that the information known to the Customs agents at the time of the arrest and ensuing search did not establish probable cause. They also contend that there were no exigent circumstances excusing the agents from obtaining a warrant before entering the plane. Because we find that Customs' search of appellants' plane at the Panama City Airport was a valid border search requiring neither a warrant nor probable cause, we need not address appellants' arguments.

██ Border searches are a well-established exception to the fourth amendment and thus require neither a warrant nor any suspicion of criminal activity. *United States v. Sheikh*, 654 F.2d 1057, 1068 (5th

Cir. 1981). "A border search need not take place at the actual border. It may be conducted at a place considered 'the functional equivalent of the border,' such as ... the airport where an international flight lands." *United States v. Richards*, 638 F.2d 765, 771 (5th Cir. 1981). Hence, where an airplane has been sighted over foreign land or water and is monitored continuously until it crosses the boundary of this country, its inspection by Customs at the first point it touches land is a valid border search.[17]

██ Government agents attached a beeper to appellants' plane on February 4, 1979 while it was located at the Miami International Airport. Apparently the plane remained at that location until the morning of February 13, 1979, when Customs agents observed it take off, headed in a westbound direction. Customs' next contact with the aircraft occurred early the following morning, when personnel with the government's radar tracking system (NORAD) informed Customs they had just "picked up a squawk on the aircraft." At the point when its signals were first registered, the plane was flying over foreign airspace.[18] Thereafter, Customs agents boarded a plane and took off in search of appellants. Agents in the Customs plane, with assistance from NORAD, sighted appellants' plane over U.S. waters just east of West Palm Beach and followed it to the Panama City Airport. NORAD apparently continued to monitor appellants' plane while it was being followed by Customs.[19] The Customs agents landed immediately behind appellants, where they were met by other Customs officers. After arresting ap-

---

17. A search such as the one involved here, which requires no warrant or suspicion of illegality and is justified solely because conducted at the "functional equivalent of the border," should be distinguished from the separate concept of an "extended border search." The latter doctrine enables government officials to search persons or goods at some point *after* they have crossed the border where there is a reasonable suspicion of secreted contraband that can be shown to have been present at the time the border was crossed. *United States v. Richards*, 638 F.2d 765, 771 (5th Cir. 1981). *See also United States v. Sheikh*, 654 F.2d 1057, 1070 n.16 (5th Cir. 1981).

18. The plane's location was south of the Bimini Islands in the Bahamas.

19. The record indicates that the Customs plane was not equipped to pick up the beeper signals directly, but that NORAD transmitted these signals to the Customs pilots to enable them to locate and sight the plane. This evidence together with the fact that NORAD was monitoring the aircraft when it reached Panama City strongly suggests that NORAD monitored the movements of appellants' plane continuously from the initial squawk over the Bahamas until its Panama City landing.

pellants, the Customs officers opened the door to appellants' plane and, looking inside, ascertained that it was loaded with marijuana. The government's evidence here established that appellants' aircraft crossed the border on February 14, 1979 and that its landing that morning at Panama City was the first point at which it touched U.S. land. Panama City was therefore the "functional equivalent of the border," and Customs' search of the aircraft there was a valid border search.

## IV. Sufficiency of the Evidence

■ Appellants argument that the evidence before the trial judge was insufficient to support their convictions is without merit. The evidence adduced before the district court [20] showed that appellants McDonnell, Flynn, and Mora were observed at the Panama City airport exiting from a plane later determined to contain thirteen tons of baled marijuana. The fingerprints of both McDonnell and Flynn were found on board the aircraft, and the registration card taken from the cockpit of the plane bore the signature of appellant McDonnell. Appellants were charged with possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1). They argue that the government's evidence showed no more than their presence on the plane and failed to establish their possession of the contraband. They suggest that the evidence was consistent with a hypothesis that Flynn and McDonnell were mere passengers who "went along for the ride" and were "less than particular about the cargo sharing their aircraft."

■ The evidence was clearly sufficient to support McDonnell's conviction. Possession of contraband may be proven by evidence (1) that defendant was in control of a conveyance and (2) that the conveyance was known by him to contain contraband. *United States v. Christian*, 505 F.2d 94, 96 (5th Cir. 1974). Intent to distribute under section 841 may be inferred from the quantity of contraband alone. *United States v. Rodriguez*, 585 F.2d 1234, 1246 (5th Cir. 1978), *on rehearing*, 612 F.2d 906 (5th Cir. 1980), *affirmed*, 449 U.S. 818, 101 S.Ct. 69, 67 L.Ed.2d 275 (1981). The parties stipulated that McDonnell previously had been employed as a pilot, and the plane registration bore his signature. The trial judge could have inferred from this that McDonnell piloted the aircraft on the date in question and that he had actual control over its cargo.

Nor does Flynn fall within the " 'passenger exception' to the general rule that one who has dominion and control of a vehicle has possession of its contents." *United States v. Christian, supra* at 96. The huge load of marijuana discovered by Customs officers in plain view inside the aircraft, and which emitted an odor so strong it was detected by the officers from the outside of the plane, negates any possible theory that any of the three men on board were unaware of its presence. *United States v. Whitmire*, 595 F.2d 1303, 1316 (5th Cir. 1979), *cert. denied*, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980); *United States v. Christian, supra* at 96. We have sustained findings of possession with respect to passengers on conveyances carrying narcotics where, in addition to proximity to the contraband and inferred knowledge of its presence, other circumstantial evidence indicates their participation in the illegal scheme. *See, e. g., United States v. Whitmire, supra; United States v. Christian, supra; United States v. Canada*, 459 F.2d 687 (5th Cir. 1972).[21] Appellants, who were having engine trouble, landed at the Panama City Airport at about three a. m. with a huge cargo of marijuana. Their trip was

20. Appellants agreed as part of a plea bargain to a nonjury trial without specific factual findings and in which the judge would consider the evidence presented in pretrial hearings as though it had been resubmitted at trial, discounting that which would not have been admissible. As a result of this arrangement, our review on the evidentiary sufficiency issue in this case places us in the unusual position of having to sort the admissible from the inadmissible evidence without knowing how the trial judge decided these questions.

21. In *Whitmire* appellant had been observed in a 25-foot Nova, speeding into an inland waterway from the "ocean side" of a cut at 8 a. m. on a cold, wet day. He was positioned in the cockpit of the boat, a point

no local jaunt; the plane had departed from Miami on the previous morning and was sighted by a Customs plane on its return flight to the United States from a point of origin outside of the country somewhere south of the Bahamas. Nonetheless, when a local airport security officer inquired as to where appellants had come from, McDonnell told him they came from Houma, Louisiana. One wheel of appellants' plane became stuck off the runway after landing, and upon being informed they would not be able to obtain immediate assistance in dislodging it, appellants set off from the airport on foot. The facts here "all contribute to the inference that [Flynn] must have realized and shared the furtive object of [McDonnell's] enterprise." *United States v. Whitmire, supra* at 1317. Hence, we find the evidence of his guilt sufficient.

AFFIRMED.

at which the odor of the 1500 pounds of marijuana aboard was "overpowering." He was wearing a soaking wet "Bimini" sweatshirt identical to that of Whitmire whose presence in Bimini just the day before was confirmed by a fuel receipt.

*United States v. Whitmire*, 595 F.2d at 1316. The court affirmed the district court's finding of possession with intent to distribute, stating:

> In the case at bar the trial judge could reasonably have concluded that the presence of such a large amount of marijuana in a boat the size of the Nova can hardly have escaped the attention of Williams. Moreover, the hour of their apprehension, their probable point of departure, their great speed to reach home port, and their flouting of boating regulations all contribute to the inference that Williams must have realized and shared the furtive object of Whitmire's enterprise. We find the evidence of his guilt sufficient.

*Id.* at 1317. Many of the same factors recognized in *Whitmire* as circumstantial evidence of participation are present here.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.